Staunton.

## LOUISVILLE AND NASHVILLE RAILROAD CO. v. O'NEIL.

September 11, 1916.

1. EASEMENTS—*Pathway—Subsequent Perchaser—Rights of Adjacent Occupants—Licensees—Invitees.*—Where a railroad company purchases a strip of land for a right of way, over which there is a well defined pathway in constant use, and stipulates that it will erect and maintain suitable and necessary crossings over its road, it takes the land subject to the rights of adjacent owners or occupiers to use such pathway. Such adjacent owners or occupiers do not occupy the position of licensees or of invitees. Their use of the pathway is a matter of right, and the railroad company owes them at least the duty to so construct its obstruction of the pathway as to be reasonably safe.

2. NEGLIGENCE—*Case at Bar—Negligence Per Se.*—Upon the evidence, in the case at bar, the plaintiff was not guilty of negligence *per se* in crossing steps placed by the defendant over a wire fence adjacent to its right of way. Whether or not he was guilty of any negligence was a question of fact for the jury under all the circumstances surrounding the plaintiff.

3. EASEMENTS—*Private Way—Obstruction.*—When a person, in the lawful use of a private way, meets with an obstruction, he may pass it if it is consistent with reasonable care to do so, which is usually a question for the jury under the circumstances of the case.

4. EVIDENCE—*Admissibility—Admissible for One Purpose.*—Where a deed given in evidence is properly admissible to show when and how the defendant acquired its right of way and the consequent relation of the defendant to the plaintiff, who was an occupant of adjoining land, it is properly in evidence for the consideration of the jury for all purposes.

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*R. T. Irvine*, for the plaintiff in error.

*A. N. Kilgore*, for the defendant in error.

SIMS, J., delivered the opinion of the court.

In the court below there was a demurrer to the evidence, which was overruled by such court, so that the evidence must be considered by this court under the rule applicable in such case.

The appellant, the defendant in the court below, acquired its right of way adjoining the land of the wife of the appellee, plaintiff in the court below, by deed from the father and mother of such wife, David C. Nickels and Clarissa Nickels, of date July 25, 1889. This right of way consisted of a strip of land passing through the farm of the grantors, leaving still owned by the latter considerable land on both sides, north and south, of such right of way. Many years before and at the time of this conveyance to the defendant, there was an established pathway in use by the grantors in passing to and from the said land on both sides of such right of way and by occupants of four or five small houses on said farm, two of which were south of the said right of way (one on same location as plaintiff's dwelling house subsequently built), and such pathway was used by the occupants of the latter also for such passing to and fro and as an outlet to and from the public road which passed through the farm. This pathway was located from the point where it entered the old county road at the east crossing of the railroad, afterwards constructed by the defendant, in a southwesterly direction several hundred feet along and over said right of way, and passed from the latter on to the land of said farm south of the said right of way at

the point where the defendant subsequently erected the stile hereinafter mentioned; thence on over said land south of said right of way—that is to say, the location of such pathway was the same when the defendant obtained its deed as when it afterwards constructed a stile across it. Many years before and at the time of such deed there was no obstruction across this pathway and it was in the open and visible use aforesaid.

The said deed was as follows:

"This deed made this the 25th day of July, 1889, between David C. Nickels and Clarissa, his wife, of the county of Wise and State of Virginia, parties of the first part, and the Louisville and Nashville Railroad Company, a corporation doing business under the laws of Virginia, party of the second part:

"Witnesseth: That in consideration of the fact that said Louisville and Nashville Railroad Company has located and now proposes to construct its Cumberland Valley branch over the lands of said David C. Nickels, situate, lying and being in the county of Wise, and State of Virginia, and 'the advantages to be derived therefrom to the said David C. Nickels, his heirs and assigns, and in consideration that said company erect and maintain suitable and necessary crossings over said road and the further consideration of the sum of sixty-five dollars, cash in hand paid;' the receipt of which is hereby acknowledged, the said parties of the first part have this day given, granted, bargained and sold and by these presents do convey to the Louisville and Nashville Railroad Company, its successors and assigns, for its Cumberland Valley branch, a strip, piece or parcel of land one hundred feet in width, beginning at a point in the center line of said railroad as now located where said line crosses

the division line between the lands of Matilda Martin and said David C. Nickels, the bearing of which line is south 31 30 east thence with a width one hundred (100) feet, measured equally fifty (50) feet on each side of said center line and running parallel therewith for a distance of one thousand and ten (1,010) feet to a line of the lands of the Virginia Coal and Iron Company, the bearing of which line is north 21 degrees east, containing two and 32-100 acres, be the same more or less.

"To have and to hold said strip or parcel of land with its appurtenances and privileges to the said Louisville and Nashville Railroad Company, its seccessors and assigns, forever.

"And the said parties of the first part, for themselves, their heirs and assigns, do· hereby release the said Louisville and Nashville Railroad Company, its successors and assigns from any further payment for or on account of the appropriation and occupancy of said strip of land as well as for all damages that may accrue by or result from the location, construction and operation of said Cumberland Valley branch of the Louisville and Nashville Railroad over and upon said strip or parcel of land, and the said David C. Nickels and Clarissa, his wife, warrants generally the land hereby conveyed, and said company is to fully protect said Nickels spring from all injury.

"Witness the following signatures and seals, this day and year first above written.

"D. C. Nickels,      (Seal)
"Clarissa Nickels. (Seal)

"Virginia, in Wise County, towit:

"I, W. S. Palmer, a Notary Public in and for the County and State aforesaid, do certify that D. C.

Nickels and Clarissa Nickels, his wife, whose names are signed to the foregoing deed bearing date the 25th day of July, 1889, have acknowledged the same before me in my county aforesaid.

"Given under my hand, this 26th day of July, 1889.
"W. S. Palmer, N. P. W. C."

David Nickels having given his daughter, the wife of plaintiff, a parcel of land, part of said farm south of the railroad right of way, and put her in possession of it, her husband, the plaintiff, "one or two years" after said railroad was constructed, built a dwelling house about seventy-five or a hundred feet south of the point where said pathway left the right of way of said railroad company, erected a paling fence along the line of such right of way dividing it from the land of his wife to the south of it, opposite the dwelling house lot, and placed a gate across said pathway at the point at which it left said right of way; and the plaintiff and his family and others having occasion to use it, continued to use such pathway without objection or hindrance from the defendant until the defendant, in March, 1913, in fencing in its right of way, in the absence of the plaintiff and his wife from home, but over the protest of his wife's mother (who was left in charge and possession of their home) and in disregard of her request for a gate, took down the paling fence above referred to and built a woven wire fence, about five feet in height, with a barbed wire at the top about four inches above the woven wire, along the line of said right of way; and in the place of said gate across said pathway it constructed steps or a stile six feet in width, extending out three feet each side of the woven wire fence. The steps were nine inches by eight inches rise, except that the top step was about six inches

wide, was immediately over the top of the woven wire, and a strand of barbed wire was about six inches over the top step, so that in passing over this stile one would go up the steps, three feet in width on one side of the wire fence, step over the barbed wire over the top step, turn on the top step about six inches in width cumbered with the barbed wire, and go down in the same direction he. came up, but on the opposite side of the wire fence.

Plaintiff being away from home at work on railroad construction when the fence and stile last named were constructed, promptly complained of the stile to the defendant on his return. On this point and as to condition and use of the stile by plaintiff and others, the plaintiff and his wife testified as follows:

O'Neil testified:

"I went to the road master and asked him several times and asked him to put me in a gate and said it was dangerous; and I said, if you will not put me in a gate, I will put it in at my own-expense; I said I am scared about that place and he told me about writing something to Middleboro; I had something else to do."

Q. How long was that before the accident?

A. That was all the time after I come back.

Q. How long had you been back from Dickenson county and living in that house before you were hurt?

A. About six weeks.

Q. I believe you stated that as soon as you discovered how they had constructed that fence you tried to get a remedy?

A. Yes, sir.

Q. State whether or not during the period of time that your picket fence was maintained there, which you say was 10 or 12 years, you had constructed

fences and cut your premises up into different lots or parcels of land?

A. Yes, sir, in wet weather it was nearly impossible to get from my house to the big road and I had to cross through a garden and through a hog lot; and when the old gate was in front of my building, I could go either way I wanted to, but when I come back my gate was pulled down and they had this barb wire contraption up there.

Q. About how long was it that you talked to the road foreman about the gate the last time before you were injured?

A. I could not say, not very long.

. . . . . . . . . . .

Q. If you had attempted to have gone through the gate at the east end, state what a distance you would have to travel and what kind of fences and conditions you would have to encounter to use that gate?

A. I would have to come over 200 feet and go across two lots to go down there; awfully rough and bad, cannot get over there in wet weather.

Q. What were the conditions at this time?

A. It was fairly dry, but the lots were very miry and muddy; water runs down out of Big Gulch, keeps that place always wet, makes connection with large culvert there.

Q. State whether or not there is any gate at the west end of your property, towards Blackwood, that you could pass through conveniently to your residence?

A. There is a gate there but I could not make a path from that to my house; it is across ravines, have to go in fields to the top of the mountain, across two or three bad gulches.

Q. What kind of fencing to cross?

A.    Rail fences, several of them; I would have to cross two or three thickets of brush; go over timber.

Q.    How far would you have to travel to use that means of ingress to your house?

A.    1-4 of a mile.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

Q.    Around from the house to the eastern gate it is nearly level land?

A.    Except for two branches comes in near gate.

Q.    Aren't you mistaken about the branches coming here?

A.    No, sir; west side of gate when it rains.

Q.    In dry weather no water there?

A.    Yes, sir; some mud there.

Q.    On the west side, what would hinder you from going from that gate straight up to your house?

A.    Two or three big dips; water comes down each one of them; big brush and young timber up there and I do not see how a fellow could get through without building a road.

Q.    How far was that gate from your house?

A.    1-4 mile.

Q.    Is it not about 300 yards?

A.    Way down to where the new bridge is built across the creek, across Powell's river, and from there to where I live is a right smart distance.

Q.    Is not this map made according to scale; is it not 200 or 250 feet?

A.    No, sir; it is worse than that; it is over 200 or 300 feet from the old homestead, is 200 or 300 feet to the gate; that was put in before the new pike was built to give us a place to bring our truck in; that was below the old plantation house, that gate is.

Q. You have got a store room on the bank oppo-
site the house?

A. Yes, sir.

Q. You come into that from the north side of
the railroad?

A. From this gate over there; yes, sir. You
come up on the old pike road.

Q. How did you get your wagons and teams in?

A. From the east gate.

. . . . . . . . . . .

A. The stile is right where the gate was.

Q. I will ask you to state, Mr. O'Neil, whether
or not there was any other convenient way in which
you could pass over the L. & N. R. R. Company's
railroad and to your premises, except by entering
your property in front at the point where you have
indicated on the map.

A. No; not without climbing fences.

Q. How long have you had your garden con-
structed on the eastern side of your house?

A. Since I built the house.

Q. What kind of fence was around it?

A. Rail fence.

Q. How long have you had that hog lot at the
marshy and swampy part of your property?

A. Ever since I lived there; it was not fit for
nothing else.

By R. T. Irvine:

Q. Your property extended out to the east there
to Mrs. Beverly's or Mrs. Boggs' property line?

A. Yes, sir.

Q. Which is just east of that east gate?

A. Yes, sir.

Q. Now there was nothing to hinder you from making you a road way on the inside of your fence down to that gate was there?

A. The lot that was laid off for the house was the building lot, and the balance of the farm was controlled by my wife's mother; they laid the line along that picket fence.

Q. You used all that land there jointly?

A. Yes, sir; my wife and her mother.

Q. You could have made a road from this house down to that path and gone out that gate easily, couldn't you?

A. Not easily.

Q. You could have made as good a road as the one outside your fence?

A. No, sir.

Q. Why?

A. It was miry and water overflows the lot.

Q. Did the water stop at the fence?

A. It goes down to the culvert; you cannot get to the gate unless you had rubber boots on.

Q. Could you not make a ditch or drain?

A. Not easily; branch runs to the gate.

Q. The branch is between the gate and Mrs. Boggs?

A. The *curvert* is.

Q. You do not have to cross the branch to get to the gate?

A. There is a branch in the lot, if you could see it; two gulches in there.

Q. Still you could have made you a road from the gate to the crossing, could't you?

A. It would have been a lot of trouble.

Q. You say the stile was dangerous?

A. Yes, sir.

Q. In spite of that you and your family and the family above you continued to go over the stile?

A. Yes, sir.

Q. You knew all the time that this stile was there and a barb wire was on top of it?

A. Yes, sir, the barb wire wire was on it from the time it was constructed until the company come and cut the wire.

Q. And you went over it all the time?

A. Yes, sir.

Q. You knew it was there from the time you came from Dickenson county until the company cut it?

A. Yes, sir.

Q. And you continued to go over it all the time?

A. We considered that was the only convenient way to go in to the house. You could not get up to the house through the gate without wading through water.

Q. Why didn't you wrap the wire with cloth?

A. The women folks covered it to keep it from catching their clothes.

Q. It was wrapped the day you got hurt?

A. No, sir; it was not.

Q. Was it wrapped after that?

A. Yes, sir; several ladies got throwed down and hurt and they wrapped it around with an old sack.

Q. At that eastern gate that goes from your property out on the railroad right of way, there is a wagon way crossing fixed across the L. & N. and the Josephine track out into the pike road?

A. That was the old county road crossing at their switch; it has not been moved.

Q. It is a good crossing and you, your wagons and teams went across there?

A.  Just fairly good.

Q.  You think the gate at the western end of your property is a quarter of a mile from your property?

A.  Yes, sir; there is a gate near the barn.

Q.  That is only 150 feet from your house?

A.  Yes, sir.

Q.  That was the one I was aksing you about yesterday?

A.  I thought you were asking me about the one on the extreme western end of my property?

Q.  They made you three gates?

A.  They made me five all told.

Q.  Three on the side you lived on and two on the other side?

A.  Yes, sir.

Q.  Could you not conveniently have gone from that gate near your barn to the right of way?

A.  I have went out that way when I have been at the barn.

Q.  In going toward Blackwood, you would go that way, would you not?

A.  No, sir."

. . . . . . . . . . . .

Q.  State whether or not there were any other ways by which you could pass to and from your residence except by using the stile or steps placed over this wire fence by the railroad company?

A.  No other way unless we went through the barn lot and out that way, or else go through a garden lot and through a hog lot to the other gate.

Q.  What was the condition of the hog lot?

A.  Real wet, a branch went through it and spread all over it, very bad to get through.

Q. It has been your custom to use this path and gate from the time the railroad was constructed?

A. Yes, sir.

Q. Prior to the time you left your house and moved to Dickenson county, state whether the railroad company ever objected to your constructing this picket fence and gate?

A. No, sir.

Q. State whether they knew that you were using this path as a passway to and from your property and the property of the people who lived on the south side of you?

A. I suppose they knew; the section people knew it; because they went back and forth through the lot.

Q. When you came back to Wise county from Dickenson county, state whether you demanded of the section foreman to put in a gate in this fence so you could pass through this wire fence?

A. I told him; I said, "I want a gate in here because some of us will be hurt or killed, one of our little boys fell off the step and got hurt," and I said, "Somebody is going to get badly hurt"—that was before Billy got hurt.

Q. State whether any guard rail or hand rail placed on these steps?

A. Nothing at all; the steps were not built up one side and down the other, but were built through the wire.

Q. The steps were in the form of a ladder with a barb wire on top of the woven wire?

A. Yes, sir.

Q. As I understand you, you come up on one side of the fence; balance yourself on top of the step; step over the barb wire and go back down on the other side?

A. Yes, sir; I hardly ever failed to catch my clothes on it and if I had a load on I had no way to save myself.

About six weeks after plaintiff's return home, during which time he had used the stile under protest, in attempting to cross over the stile he hung his feet in the barbed wire over the top step and was thrown to the ground and sustained the injuries of which the declaration complains.

There are only two assignments of error, namely:

1. That the court below erred in overruling the demurrer to the evidence and giving judgment for plaintiff.

2. That the court below erred in admitting in evidence the deed from D. C. Nickels and wife to the defendant.

A number of questions are raised and discussed by counsel for plaintiff, but in the view we take of it, the decision of two questions will be decisive of the case, namely:

(1) What duty did the defendant owe to the plaintiff? Was it the duty to a licensee or an invitee, or a higher duty than to an invitee?

(2) Was the plaintiff guilty of contributory negligence *per se*, at the time he was injured, in attempting to pass over the obstruction caused by the stile—an open and obvious danger?

We will consider these questions in the order stated.

(1) What duty did the defendant owe to the plaintiff? Was it the duty to a licensee or an invitee, or a higher duty than to an invitee?

Counsel for defendant state: "The case stands exactly on the same footing as if it were between two farmers or two adjoining lot owners in a city." With this we fully agree. But such counsel then take the

position that defendant did not owe to the plaintiff any duty higher than it would have owed to a mere licensee; that it did not owe to him as high a duty as it would have owed to an invitee. With this we cannot agree. Hence we do not herein discuss the numerous authorities cited and quoted by counsel for defendant on this point, as they all bear on the duty owing to a mere licensee, although they have all been carefully considered before the conclusion was reached covered by this opinion.

We are of opinion that under the circumstances above noted as to the existence for many years and use of said pathway, giving notice to the defendant of the easement referred to, in accordance with the well settled rule on the subject, the defendant took such land subject to the rights of the adjacent owners or occupants to use such pathway.

As was held by this court in *Scott v. Moore*, 98 Va. 668, 37 S. E. 342, 81 Am. St. Rep. 749, per syllabus of the case:

"*Easements—Visibility—Presumed Intention of the Purchaser.*—A purchaser is presumed to have contracted with reference to the condition of the property at the time of the purchase. If the condition of the premises shows plainly and unmistakably that an alleyway has been used, was in use and was intended for the use of the owner or occupant of an adjacent lot, the purchaser will take subject to the rights of the adjacent owner or occupant."

This view is strengthened in the case at bar by the provision in said deed to the effect that the defendant should "erect and maintain suitable and necessary crossings over said road" (railroad), evidencing that the defendant recognized at the time it took such deed the existence of more than one easement of private way

40

left appurtenant to the land retained by the grantors, subject to which the defendant not only took its conveyance but agreed in addition to construct crossings therefor over its railroad when it came to build the latter.

The plaintiff, therefore, as the occupant of the land adjacent to the land of the defendant, over which latter land there was the easement above stated, subject to which the defendant acquired its land, had the right to use said pathway with no greater obstruction thereof than the gate placed therein by the plaintiff himself. Hence, this is not a case of the defendant permitting the plaintiff to use such pathway as a matter of grace, accommodation or gratuity—in other words, the plaintiff in the use of such way did not occupy the position of a licensee. Indeed his position was even higher than that of an invitee. His use of it was a matter of right.

We think, therefore, that when the defendant obstructed this pathway against the protest of the representative of the plaintiff left in occupancy of his property, it owed him at least the duty to use due care so to construct such obstruction that it should be reasonably safe for the use of the plaintiff as compared with the gateway displaced by it. The principle is the same as that applicable to the obstruction in or the alteration of the condition of a street or roadway which others have the right to use.

"Where a railroad company, knowing the public use of a road which crosses its tracks, built approaches thereto but left them in a condition dangerous to travel by teams managed with ordinary care, and one using such care was injured on account of such condition, the company was liable, whether the road was technically a public or private one." *Yazoo, etc. R. Co.* v. *Watson,* 82 Miss. 89, 33 So. Rep. 942.

"It is the duty of any person making repairs to a common hallway, or passageway, or street, or place where the public are lawfully passing, to take reasonable precautions against accidents. The defendant, Johnson, seeks to relieve himself from the consequences of this rule by pointing out that there were no contractual relations between himself and the plaintiff, but this duty to be careful does not grow out of a contractual relation; it arises from that basic and necessary regulation of civilization which forbids any person because of his own convenience, to recklessly, headlessly or carelessly injure another. Nobody is permitted by the law to create with impunity a stumbling block, a trap, a snare or a pitfall for the feet of those rightfully proceeding on their way." *Hicks* v. *Smith*, 158 App. Div. 303, 143 N. Y. Supp. 139.

The principle announced in the quotation just made was approved by this court in an opinion by Harrison, J., in the case of *City Gas Co. of Norfolk* v. *Lawrence*, 118 Va. 557, where the same citation is quoted.

The rule as to the duty one owes an invitee in the use of a way is practically the same. *Richmond, &c. R. Co.* v. *Moore*, 94 Va. 493, 27 S. E. 70, 37 L. R. A. 258, and other authorities too numerous to cite.

The same rules apply to the failure on the part of the defendant to remove said obstruction and its continuing to maintain it after the protest of the plaintiff, his request for its removal and the notice given the plaintiff by defendant of the dangerous condition of such obstruction.

We come now to consider the question—

(2) Was the plaintiff guilty of contributory negligence *per se* at the time he was injured in attempting to pass over the obstruction caused by the stile—an open and obvious danger?

The rule respecting contributory negligence as applied to the encountering of open and obvious dangers, while the same in principle, is somewhat different in its effect as applied to the use of streets or roadways, from its application in some other cases.

"When a person, in the lawful use of a highway, meets with an obstruction, he may pass if it is consistent with reasonable care so to do; and this is generally a question for the jury, depending upon all the circumstances surrounding the party." *Newport News, &c. Co.* v. *Bradford*, 99 Va. 120-1, 37 S. E. 809, citing a number of authorities.

In the case at bar the plaintiff was interrogated on the point as to the care used by him in crossing the stile at the time of his fall and injury, and he expressly testified on this subject as follows:

Q. State whether or not you used caution and care in trying to cross that pair of steps or stile?

A. Yes, sir; mighty cautious about it.

(And see testimony above quoted showing the situation surrounding the plaintiff as to the inconvenience of his ceasing to use this pathway.)

We are, therefore, of opinion that the plaintiff was not guilty of negligence *per se;* and that this question was a question of fact for the jury upon all the circumstances surrounding the plaintiff.

As to the assignment of error on the ground that the admission in evidence of the deed from Nickels and wife above referred to was erroneous: As such deed was properly admissible in evidence to show how the defendant acquired its right of way and when, and the consequent relation of defendant to the plaintiff, an occupant of adjoining land—being admissible for one purpose, it was properly in evidence for the consideration of the jury for all purposes; hence, no dis-

cussion of the different grounds taken by counsel for defendant as to its inadmissibility in evidence is deemed necessary.

Taking the view we do, above expressed, of the legal duty the defendant owed to the plaintiff, we are of opinion that there was sufficient evidence before the jury to warrant them in finding that such duty was not discharged; and also that the plaintiff was not guilty of contributory negligence.

It seems to us, therefore, that there is no error in the judgment complained of overruling the demurrer to evidence interposed in the court below, and such judgment is affirmed.

*Affirmed.*