Present:  All the Justices

RGR, LLC

                                           OPINION BY
v.  Record No. 130633         CHIEF JUSTICE CYNTHIA D. KINSER
                                          OCTOBER 31, 2014[1]
GEORGIA SETTLE, PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CHARLES E. SETTLE, SR., DECEASED

            FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                     Mary Grace O'Brien, Judge

     In this wrongful death action arising out of a collision at

a private railroad crossing, RGR, LLC, (RGR) appeals the jury's

verdict awarding $2.5 million to Georgia Settle (Mrs. Settle)

for the death of her husband, Charles E. Settle, Sr. (Settle).

We conclude that the circuit court did not err in holding that

RGR owed a duty of reasonable care to Settle or in instructing

the jury on that duty, and in finding that Settle was not

contributorily negligent as a matter of law and that RGR's

negligence was a proximate cause of the collision.  We therefore

will affirm the circuit court's judgment sustaining the jury's

verdict.  We also conclude, however, that the circuit court

erred in calculating the offset required under Code § 8.01-35.1.

                      I.  FACTS AND PROCEEDINGS

     In October 2004, Settle was fatally injured when a train

owned and operated by Norfolk Southern Corporation (Norfolk

_____

     [1] The Court withdrew the prior opinion rendered June 5,
2014, reported at 288 Va. 1, 758 S.E.2d 215 (2014), after
granting a petition for rehearing by Order dated August 1, 2014.

Southern) struck the dump truck he was operating. At the time of the collision, Settle was traveling on Kapp Valley Way, a private road that crosses railroad tracks owned by Norfolk Southern.[2] Because the railroad crossing was private, it was controlled with only "crossbuck signs." There were no stop signs, warning signals, or barriers.

Adjacent to the railroad tracks, the defendant, RGR, operated a business offloading lumber from train cars and reloading it onto tractor-trailers.[3] On the date of the accident, RGR's lumber was stacked near the railroad tracks and seven feet inside Norfolk Southern's 30-foot right-of-way. The edge of the lumber stacks was 23 feet from the center of the tracks. The collision occurred after Settle traveled past the lumber stacks and started to cross the railroad tracks. The train hit the front side of Settle's truck.

Mrs. Settle, as personal representative of her deceased husband's estate, filed this wrongful death action seeking compensatory damages and named in her fourth amended complaint RGR, Norfolk Southern, and two other commercial business entities as defendants. Mrs. Settle alleged that the defendants created a hazardous condition by stacking lumber near the

---

[2] The scene of the accident is shown in the photograph appended to this opinion.

[3] RGR had operated its business at that location for 34 years and was leasing the property on which its business was situated at the time of the accident.

2

railroad tracks, breached their duty of reasonable care to Settle by blocking the view of those traveling on Kapp Valley Way, and failed to take reasonable steps to make the railroad crossing safe.[4]  As a result, Settle, according to the allegations, could not see the approaching train in sufficient time to stop and avoid the collision.

Prior to trial, RGR filed a demurrer, arguing that Mrs. Settle failed to set forth facts that, if proven, would establish that RGR owed a duty to Settle or that it breached any duty owed to Settle.  In support, RGR argued that Settle was a stranger to its business, was fatally injured on a third-party's property, and thus no duty arose.  RGR also asserted that Mrs. Settle's allegations established that Settle was contributorily negligent as a matter of law. The circuit court overruled the demurrer.[5]

---

[4] Before trial, the claim against Norfolk Southern was settled, and the claims against the other two defendants were dismissed with prejudice.

The fourth amended complaint also included a claim for negligence per se and sought punitive damages.  The circuit court sustained RGR's demurrer and dismissed the negligence per se claim and request for punitive damages without leave to amend.

[5] RGR also filed a motion to limit Mrs. Settle's evidence to a "concerted action/joint enterprise" theory of liability, which the circuit court denied on the grounds that Mrs. Settle included allegations that RGR was jointly or individually liable.

3

At trial, the parties stipulated to certain facts. A third party owned Kapp Valley Way, and Norfolk Southern owned both the railroad tracks on which the accident occurred and a right-of-way that extended 30 feet in each direction from the center of the tracks. Norfolk Southern's trains came from both directions on the tracks that crossed Kapp Valley Way, and its trains did not come at the same time every day. The particular train that struck Settle's truck was traveling at approximately 45 miles per hour and was composed of three engines and more than 100 cars. Settle's dump truck was 30 feet in length and measured eight feet from its front end to the back of the interior of the cab. At the time of the accident, Settle's truck was loaded with 13.21 tons of gravel that he was delivering to a county sewer system pipeline construction site. Settle held a commercial driver's license (CDL) and was employed as a dump truck driver.

Settle was driving southbound on Kapp Valley Way (from left to right in the photograph) toward the railroad crossing. The train was traveling east (from bottom to top in the photograph), approaching Settle from his right. RGR's lumber stacks were situated on the north side of the tracks at the corner where Kapp Valley Way crosses the railroad tracks. According to a representative from Norfolk Southern, the sightline at the point where Kapp Valley Way crosses the railroad tracks extended 800

4

feet to the west, the direction from which the train came that struck Settle's truck, and 600 feet to the east.

The Norfolk Southern representative also testified regarding the right-of-way. He stated that Norfolk Southern's right-of-way was property the company owned adjacent to the railroad tracks. According to the representative, the right-of-way "serve[d] multiple purposes[,] the most important" of which was safety. The representative explained that "maintain[ing] clear sight distance" was one of the purposes regarding safety: "A right-of-way allows . . . both our locomotive train crews and the public to safely proceed across the tracks." He further testified that RGR's lumber "was not supposed to be stored in the right-of-way."

Receipts from Settle's deliveries on the day of the accident reflected that he was making his seventh trip to deliver gravel to the construction site when the collision occurred. One of Settle's co-employees, who had also driven over the crossing on Kapp Valley Way numerous times, testified, via deposition, that his usual practice was not to stop at the crossing but simply to slow down, check for a train, and proceed over the tracks if a train was not present. The employee stated that it was possible to stop before reaching the tracks if a train was approaching but that he had never come to a complete stop before crossing the tracks. According to the employee,

5

"you couldn't see like you should" and if the lumber stacks were "out of the way, it would have been a whole lot better."  He also stated that no one ever complained to RGR or Settle's employer about the lumber stacks' obstructing the view of the railroad tracks from Kapp Valley Way.

Timothy Weston, the owner of a commercial truck repair company, testified for Mrs. Settle as an expert on the operation of the dump truck Settle was driving when he was fatally injured.  According to Weston, a truck like Settle's, if fully loaded, will accelerate in first gear from a stationary position at the speed of one-to-two miles per hour.  In second gear, the truck, according to Weston, will increase its speed to two-to-three miles per hour and will travel at five miles per hour in third gear.  In this particular type of truck, shifting between gears requires the driver to "push the clutch in, put the truck in neutral, [and] push the clutch back in," timing it "with the engine speed [and] decreasing the rpm of the engine . . . when you go into gear."  According to Weston, if the driver misses a gear, the truck is in neutral, and if fully loaded, will stop. Weston stated that, "[i]n a panic," a driver will "miss [a gear] every time."  Weston approximated that coming to a complete stop with a full load while traveling five miles per hour would

require about ten feet.[6]  Weston also testified that due to

various noises inside the cab of the truck while driving, it is

difficult to hear noises outside the cab.

Jose Mendosa was driving a box truck on the opposite side

of the tracks, traveling northbound on Kapp Valley Way (from

right to left in the photograph).  Mendosa and his passenger,

Luis Bonilla, testified that they saw the train approaching from

the railroad crossing at Route 15, to their left, and stopped

their truck at the crossing.[7]  Mendosa and Bonilla both stated

that they heard the train's horn once, before the train reached

the Route 15 crossing, but denied that the train blew its horn

again from the time it crossed Route 15 until it hit Settle's

truck.  Mendosa saw Settle's truck approaching the crossing and

stated that Settle was traveling "very slowly," about five miles

per hour.  Mendosa and Bonilla both attempted to get Settle's

attention by waving their arms at him as he neared the crossing,

but neither could see Settle's face through his truck's

windshield.  Mendosa also testified that he had crossed the

---

[6] The parties agreed that five miles per hour equals 7.33 feet per second, and the circuit court took judicial notice that the average driver's "perception-reaction time" is 1.5 seconds.

[7] The record does not reflect the distance between the railroad crossing at Route 15 and the Kapp Valley Way crossing. Testimony and several photographic exhibits, however, demonstrate that there is a curve in the track between Route 15 and the Kapp Valley Way crossing.

track on Kapp Valley Way several times that day and that "it was difficult to see because of the lumber piles."

Danny Humphreys owned a business on Kapp Valley Way and was driving a pick-up truck that stopped behind Mendosa and Bonilla at the crossing. Humphreys stated that he did not hear the train but that his windows were rolled up, he was on the telephone, and his air-conditioning was running. Humphreys also had traveled on Kapp Valley Way many times the day of the accident and testified that, when approaching the crossing as Settle did, he could not see the tracks to the right because of the lumber stacks. According to Humphreys, one could only see whether a train was approaching "[w]hen you get to the edge of the lumber pile" and that "you would have to kind of look around the corner." In addition, because the Kapp Valley Way crossing was only one lane wide, a driver had to stop if other vehicles were present and take turns crossing the railroad tracks. In Humphreys' experience, most of the trains that crossed Kapp Valley Way came from the east heading west (from top to bottom in the photograph), i.e., in the opposite direction as the train that struck Settle's truck.

Michael White was employed by RGR and was working outside in the lumber yard when the accident occurred. Although White did not witness the accident, he testified that he heard the train's horn before it crossed Route 15 and then heard a screech

8

and a bang from the accident perhaps 30 seconds later. Michael Lawson, White's supervisor, was also outside and likewise estimated that about 30 seconds elapsed between the time the train blew its horn and the accident occurred.

Roger Janney, the conductor of the Norfolk Southern train that struck Settle's truck, testified that the engineer blew the train's horn and started slowing the train as it approached the Route 15 crossing. Between the Route 15 crossing and the Kapp Valley Way crossing, Janney stated, the engineer again blew the horn sequence of "two more longs, a short and a long." Janney said that as the train "came around the curve" after crossing Route 15 and approached the Kapp Valley Way crossing, he saw Settle's truck come into sight from behind a building. Janney next saw Settle as the front of his truck appeared from behind the lumber stacks. According to Janney, Settle was looking straight ahead. Janney could not estimate Settle's speed but stated that the truck was moving slowly. Thomas Street, the train's engineer, also claimed that he blew the train's horn before reaching Route 15, again blew the "two longs, a short and a long" sequence after Route 15, continued blowing the horn until the moment of impact, and in fact broke the horn handle doing so. Street stated that he saw Settle twice before his truck reached the crossing, that Settle was looking straight

9

ahead when he entered the crossing, and that Settle was driving about two-to-four miles per hour.

Richard Young, testifying for RGR as an expert on drivers with a CDL, stated that such a driver would be required to stop at the crossing adjacent to the lumber stacks because the driver would not be able to see if a train was coming until he or she was within 15 feet of the tracks. Young conceded, however, that a driver would not be required to stop if, using ordinary care, the driver believed there was no train coming. Young also agreed that "commercial drivers should not stop closer than 15 feet from the rail crossing" to protect the safety of such drivers.

According to White, RGR's owners visited the site infrequently and never instructed him or Lawson, the two employees responsible for the day-to-day operations of the facility, as to where to stack the lumber offloaded from the trains or how high to stack it. Lawson believed that Norfolk Southern's right-of-way extended only 20-25 feet on each side of the tracks and that RGR's lumber stacks were not encroaching on the right-of-way. Lawson conceded, however, that he never checked to be sure about the width of the right-of-way, and one of RGR's owners testified that prior to the accident, RGR knew the right-of-way extended 30 feet from the center of the tracks. That owner also conceded that the lumber stacks "needlessly

10

cut[ ] down the visibility of a motorist" traveling on Kapp Valley Way.

At the close of Mrs. Settle's evidence and again at the close of all the evidence, RGR moved to strike. RGR argued that it owed no duty to Settle because he was not on RGR's property and was injured by a third party. According to RGR, Settle's "status" with respect to RGR's property had "never been established," and RGR's only duty with respect to the lumber stacks was owed to Norfolk Southern, not Settle. RGR also maintained that the evidence established that Settle was contributorily negligent as a matter of law because he never looked to see if a train was approaching and his failure to do so, not RGR's lumber stacks, was a proximate cause of the accident. The circuit court denied the motions to strike, finding that RGR owed a duty of ordinary care and stating that "[t]here are too many variables that have been introduced . . . with regard to speed, distance, [and] times crossed" that rendered the question of contributory negligence one for the jury.

Over RGR's objection, the circuit court instructed the jury that "[i]n the absence of evidence to the contrary, it is presumed that an owner or vendor of lands knows the area and boundaries of such, and whether an encumbrance is on his or her property or adjacent property." The court also instructed the

11

jury, again over RGR's objection, that "[e]very person has the duty to exercise ordinary care in the use and maintenance of its property to prevent injury or death to others."

The jury returned a verdict for Mrs. Settle in the amount of $2.5 million, along with pre-judgment interest from October 12, 2008. RGR filed a motion to set aside the verdict, again raising its arguments related to duty, contributory negligence, and proximate cause. In the alternative, RGR requested a new trial or a remittitur of the verdict. The circuit court denied RGR's motions.

On mutual agreement of both parties, however, the circuit court suspended entry of the final order to address the parties' disagreement on how to calculate the offset of the $500,000 settlement Mrs. Settle obtained from Norfolk Southern, pursuant to Code § 8.01-35.1(A)(1). Mrs. Settle claimed that the provisions of Code 8.01-35.1(A)(1) require that the settlement amount be deducted from the sum of the $2.5 million verdict plus the prejudgment interest awarded by the jury. RGR, on the other hand, argued that the amount of the settlement between Norfolk Southern and Mrs. Settle should be subtracted from the $2.5 million jury award, with prejudgment interest then calculated on the difference.

The circuit court agreed with Mrs. Settle and, in a final order, held that the "amount recovered" under Code § 8.01-

12

35.1(A)(1) included "both the principal amount awarded by the jury of $2.5 million plus the prejudgment interest also awarded by the jury," which totaled $3,085,205.48. The court reduced that sum by the amount of the settlement with Norfolk Southern, entered judgment against RGR in the amount of $2,585,205.48, and awarded "post-judgment statutory interest . . . on the principal verdict amount of $2,500,000.00 from" the date of the verdict until paid. This appeal followed.

## II. ANALYSIS

On appeal, RGR asserts that it owed no duty to Settle and that the circuit court erred in instructing the jury with respect to the issue of duty. RGR next argues that Settle was contributorily negligent as a matter of law and that his negligence, and not its lumber stacks, was the proximate cause of the accident. Finally, RGR asserts that the circuit court erred in calculating the offset required by Code § 8.01-35.1. We will address the issues in that order.

### A. Duty and Jury Instructions

RGR contends that it owed no duty to Settle as a third party traveling on a private road located on private property adjacent to the property on which it conducted its business. It asserts that Virginia does not recognize a duty of reasonable care with regard to obstructions on private property that do not "touch upon or invade the private road" nor a duty to protect

13

"mere sight lines." RGR claims that the jury instructions thus were erroneous because the instructions allowed the case to proceed on a premises liability theory.

"[W]hether a legal duty in tort exists is a pure question of law" reviewed de novo on appeal. Volpe v. City of Lexington, 281 Va. 630, 636, 708 S.E.2d 824, 827 (2011) (internal quotation marks omitted). Likewise, we review de novo whether a jury instruction accurately states the law. Hawthorne v. VanMarter, 279 Va. 566, 586, 692 S.E.2d 226, 238 (2010). In considering whether an instruction was properly given, "our responsibility is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." Bennett v. Sage Payment Solutions, Inc., 282 Va. 49, 55, 710 S.E.2d 736, 740 (2011) (internal quotation marks and citation omitted). "[A] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." Id. (internal quotation marks omitted).

"[N]egligence is the violation of a legal duty which one owes to another, and where there is no legal duty there is no actionable negligence." Veale v. Norfolk & Western Ry. Co., 205 Va. 822, 825, 139 S.E.2d 797, 799 (1965). "'Negligence, in law, involves the conception of a duty to act in a certain way toward

14

others, and a violation of that duty by acting otherwise.'" Cleveland v. Danville Traction & Power Co., 179 Va. 256, 260, 18 S.E.2d 913, 915 (1942) (quoting Cooke v. Elk Coach Line, Inc., 180 A. 782, 783 (Del. Super. Ct. 1935)). Thus, "[a]n action for negligence only lies where there has been failure to perform some legal duty which the defendant owes to the party injured." Balderson v. Robertson, 203 Va. 484, 487-88, 125 S.E.2d 180, 183 (1962) (internal quotation marks omitted) (collecting cases).

General negligence principles require a person to exercise due care to avoid injuring others. Overstreet v. Security Storage & Safe Deposit Co., 148 Va. 306, 317, 138 S.E. 552, 555 (1927) (recognizing a duty "owed to mankind generally . . . not to do any act which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject [another person] to peril"); Charles E. Friend, Personal Injury Law in Virginia § 1.1.1., at 2 (3rd ed. 2003) ("There is . . . a general duty not to injure others [that] arises whenever [a] defendant's conduct creates a risk of harm to others."). The "broad common law maxim" sic utere tuo ut alienum non laedas requires that "one must so use his own rights as not to infringe upon the rights of another." Cline v. Dunlora South, LLC, 284 Va. 102, 107, 726 S.E.2d 14, 17 (2012). Recognition that "a duty of care is ordinarily owed to avoid conduct that creates risks of harms to others" is the majority

15

view of both courts and commentators.  2 Dan B. Dobbs, The Law of Torts § 251, at 2-3 (2d ed. 2011) ("[W]here the defendant by some action on his part, creates, maintains, or continues a risk of physical harm, the general standard or duty is the duty of reasonable care, that is, the duty to avoid negligent conduct.").

This general duty is owed to those within reach of a defendant's conduct.

> [W]henever one person is by circumstances placed in such a position with regard to another . . . that if he did not use ordinary care and skill in his own conduct with regard to those circumstances, he would cause danger of injury to the person or the property of the other, a duty arises to use ordinary care and skill to avoid such injury.

Southern States Grain Mktg. Coop. v. Garber, 205 Va. 757, 761, 139 S.E.2d 793, 796 (1965) (quoting Standard Oil Co. v. Wakefield, 102 Va. 824, 832, 47 S.E. 830, 832 (1904)).

With regard to property, the common law requires that "'every person [must] exercise ordinary care in the use and maintenance of his own property to prevent injury to others.'" Perlin v. Chappell, 198 Va. 861, 864, 96 S.E.2d 805, 808 (1957) (quoting Rice v. Turner, 191 Va. 601, 605, 62 S.E.2d 24, 26

16

(1950));[8] accord Standard Oil Co., 102 Va. at 828, 47 S.E. at 831

(recognizing the "duty of every man to so use his own property

as not to injure the persons or property of others").

> [The] person in possession of property . . .
> has a privilege to make use of the land for
> his own benefit[.]  [B]ut . . . this
> privilege is qualified by a due regard for
> the interests of others who may be affected
> by it.  The possessor's right is therefore
> bounded by principles of reasonableness, so
> as to cause no unreasonable risk of harm to
> others in the vicinity.

W. Page Keeton, et al., Prosser & Keeton on Torts § 57, at 386

(5th ed. 1984); accord Cline, 284 Va. at 107, 726 S.E.2d at 17

(holding that the common law principle "sic utere tuo ut alienum

non laedas . . . precludes use of land so as to injure the

property of another"); Schulz v. Quintana, 576 P.2d 855, 856

(Utah 1978) ("A landowner may use his property as he sees fit,

subject, however, to having due regard for the safety of others

who may be affected by it.  The owner is under an obligation to

make such reasonable use of his property that it will not cause

unreasonable harm to others in the vicinity thereof."); see also

Justice v. CSX Trans., Inc., 908 F.2d 119, 123-24 (7th Cir.

1990) (applying common law duty that "a person may not use his

land in such a way as unreasonably to injure the interests of

---

[8] Perlin and Rice both addressed negligence claims involving
personal injuries inflicted by cattle that had escaped from the
premises where they were confined.

17

persons not on his land - including owners of adjacent lands[,] other landowners and the users of public ways" to a company that placed obstacles blocking the view of a traveler approaching a railroad crossing); Lawson v. Safeway Inc., 119 Cal. Rptr. 3d 366, 372-73 (Cal. Ct. App. 2010) (applying duty of ordinary care to defendant when the defendant's parked truck obstructed the view of motorists at an intersection); Langen v. Rushton, 360 N.W.2d 270, 275 (Mich. Ct. App. 1984) (holding that the defendant had "a duty . . . to provide motorists . . . with an unobstructed view" as they entered traffic); Boudreaux v. Sonic Indus., Inc., 729 P.2d 514, 516-17 (Okla. Civ. App. 1986) (applying the duty of a property owner "to maintain his property in such a manner that . . . it does not create an unreasonable hazard to travelers upon the abutting roadway," to a restaurant whose sign obstructed the view of travelers because "it is immaterial whether the injury is caused by physical contact or by another means such as here").

At common law, however, this duty did not extend to natural conditions existing on land as opposed to artificial conditions such as RGR's lumber stacks.[9] Compare Cline, 284 Va. at 106, 726 S.E.2d at 16 ("At common law, a landowner owed no duty to those outside the land with respect to natural conditions existing on

_____

[9] No one suggests that the lumber stacks were anything other than an artificial condition on RGR's land and Norfolk Southern's right-of-way.

the land, regardless of their dangerous condition."), with Restatement (Second) of Torts § 364 (1965) ("A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm."). Likewise, an owner or possessor of land adjacent to a highway has no common law duty to persons traveling on the highway with regard to natural conditions on the land. See Cline, 284 Va. at 109, 726 S.E.2d at 18 ("The duty owed by adjoining property owners is to refrain from engaging in any act that makes the highway more dangerous than in a state of nature or in the state in which it has been left.") (emphasis added); Price v. Travis, 149 Va. 536, 542, 140 S.E. 644, 646 (1927) (observing that the "duty of others is to abstain from doing any act by which any part of the highway would become more dangerous to the traveler than in a state of nature, than in the state in which the [public entity] has left it") (emphasis added); see also Driggers v. Locke, 913 S.W.2d 269, 272 (Ark. 1996) (holding that a landowner had no duty to control vegetation on his land for the benefit of users of an adjacent highway); Williams v. Davis, 974 So.2d 1052, 1062 (Fla. 2007) (finding a landowner had no duty to motorists with regard to natural conditions contained wholly within the private property's boundaries); Pyne v.

Witmer, 512 N.E.2d 993, 997 (Ill. App. Ct. 1987) (refusing to impose duty on a landowner to remove foliage on his property so that motorists approaching an intersection could see other motorists); Krotz v. CSX Corp., 496 N.Y.S.2d 190, 191 (N.Y. App. Div. 1985) (finding no duty requiring a landowner to control vegetation on property for the benefit of users of a public highway).

RGR does not dispute these common law tort principles regarding duty. Instead, it contends that this case erroneously proceeded to the jury on a theory of premises liability. On brief, RGR states that it "agrees this is not a premises liability case." It claims, however, that the circuit court nevertheless relied on premises liability precedent in several of its holdings, including whether RGR owed a duty to Settle.

RGR misconstrues Mrs. Settle's position and the circuit court's holdings. In her fourth amended complaint, Mrs. Settle alleged that RGR, as well as the other named defendants, "owed a duty of reasonable due care" to Settle "in the care, maintenance, upkeep, [and] inspection" of both Norfolk Southern's right-of-way and the property upon which the lumber was stacked. Mrs. Settle further alleged that the defendants "breached their duties of reasonable care" to Settle by, among other things, "allowing . . . stacks of lumber to exist such

20

that they blocked the view of motorists approaching the Kapp Valley Crossing."

Moreover, the circuit court instructed the jury that "[e]very person has the duty to exercise ordinary care in the use and maintenance of its property to prevent injury or death to others."[10] Based on the common law principles already discussed with regard to duty, this instruction is a correct statement of the law, and the circuit court did not err in giving it. See Perlin, 198 Va. at 864, 96 S.E.2d at 808; Prosser & Keeton on Torts § 57, at 386. The instruction supports Mrs. Settle's theory of the case. See Bennett, 282 Va. at 55, 710 S.E.2d at 740. It also demonstrates that premises liability was not an issue and that the case was not tried on that basis. To suggest otherwise is simply incorrect.

RGR also advances several other theories as to why it was not subject to the common law duty outlined above. Despite its

_____

[10] RGR also argues that the circuit court erred in giving the jury instruction stating that "[i]n the absence of evidence to the contrary, it is presumed that an owner or vendor of land knows the area and boundaries of such, and whether an encumbrance is on his or her property or adjacent property." RGR asserts that the instruction pertained to a premises liability theory for which there was no evidence. As the circuit court stated, however, "the issue of where the right-of-way [is] and the knowledge of the right-of-way [was] raised." One of RGR's owners testified that RGR was unaware of the extent and size of Norfolk Southern's right-of-way. This instruction addressed that issue and did not allow the jury to find RGR liable on a premises liability theory. The circuit court did not err in giving it.

21

statement on brief acknowledging that this case is not one of premises liability, RGR nevertheless attempts to interject premises liability concepts by arguing that it owed no duty to Settle because he "was, at most, an <u>invited guest</u> using a private roadway and a private railroad crossing on" another entity's property. (Emphasis added.) Regardless of Settle's status in relation to the owner of Kapp Valley Way, we stated in <u>Dudley v. Offender Aid & Restoration of Richmond, Inc.</u>, 241 Va. 270, 401 S.E.2d 878 (1991), that "'[i]n order for the actor to be negligent with respect to the other, his conduct must create a recognizable risk of harm to the other individually, or <u>to a class of persons – as, for example, all persons within a given area of danger</u> – of which the other is a member.'" <u>Id.</u> at 278, 401 S.E.2d at 882-83 (quoting Restatement (Second) of Torts § 281 cmt). "[W]henever the circumstances . . . are such that an ordinary prudent person could reasonably apprehend that, as a natural and probable consequence of his act, another person rightfully there will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises." <u>Overstreet</u>, 148 Va. at 318, 138 S.E. at 555.

The existence of this duty does not depend on proving a particular relationship;

> it arises from that basic and necessary
> regulation of civilization which forbids any
> person because of his own convenience, to

22

> recklessly, heedlessly or carelessly injure another. Nobody is permitted by the law to create with impunity a stumbling block, a trap, a snare or a pitfall for the feet of those rightfully proceeding on their way.

Louisville & Nashville R.R. Co. v. O'Neil, 119 Va. 611, 627, 89 S.E. 862, 866 (1916) (internal quotation marks omitted); see also Friend, Personal Injury Law in Virginia § 1.1.1., at 2 ("[T]he only 'relationship' which must exist is a sufficient juxtaposition of the parties in time and space to place the plaintiff in danger from the defendant's acts.").

Settle was "within a given area of danger" created by the location of RGR's lumber stacks. The lumber was situated within Norfolk Southern's right-of-way and obstructed the sight line of motorists on Kapp Valley Way as they approached the railroad crossing. Dudley, 241 Va. at 278, 401 S.E.2d at 883. One of the purposes of the railroad's right-of-way was to maintain clear sight lines for motorists and the train crew. Settle was also "rightfully" traveling on Kapp Valley Way within feet of RGR's lumber stacks at the time of the accident. Overstreet, 148 Va. at 318, 138 S.E. at 555. Thus, RGR owed a duty to Settle to exercise ordinary care. See id.

RGR next argues that this Court has never "recogniz[ed] a duty to protect mere sight lines." RGR is correct that we have never found a duty of owners or possessors of land to protect the sight lines of motorists traveling on adjacent roadways, and

23

we make no such holding here.  Rather, we affirm what has been consistently recognized: one has a duty to exercise ordinary care in the use and maintenance of one's property to prevent injury to others.  See Perlin, 198 Va. at 864, 96 S.E.2d at 808. The negligent act in this case was RGR's obstruction of the sight line at the railroad crossing by stacking its lumber within Norfolk Southern's right-of-way, an area designed to maintain clear sight lines for motorists and the train crew. Applying the common law duty to particular factual settings, however, does not necessarily result in liability in all instances.  See Boggs v. Plybon, 157 Va. 30, 38, 160 S.E. 77, 80 (1931) ("[S]ome particular act which would be actionable negligence under one set of circumstances [will] give no basis for recovery in another."); Smith v. Lamar, 212 Va. 820, 823, 188 S.E.2d 72, 74 (1972) ("The amount or degree of diligence and caution which is necessary to constitute reasonable or ordinary care depends on the circumstances and the particular surroundings of each specific case."); Dobbs, The Law of Torts § 253, at 10 ("[J]udges must follow the reasonable care standard, leaving it to juries to apply the reasonable person standard to particular conduct.").

Instead, the question whether under a particular set of facts one is liable for obstructing the sight line of a traveling motorist raises the issues of breach of duty for

24

failure to exercise ordinary care in the circumstances and proximate causation. Whether a duty to exercise ordinary care is owed does not depend on those issues and their resolution by the factfinder. In other words, in framing the duty question as whether a "duty to protect . . . sight lines" is recognized, RGR attempts to transform factual determinations about breach and proximate causation to be resolved by the factfinder into a legal determination made by the trial court as a matter of law. While "[t]he law determines the duty, . . . the jury, upon the evidence, determines whether the duty has been performed." Commonwealth v. Peterson, 286 Va. 349, 357, 749 S.E.2d 307, 311 (2013) (internal quotation marks omitted); see Whitt v. Silverman, 788 So.2d 210, 221 (Fla. 2001) ("[T]he imposition of a duty is nothing more than a threshold requirement that if satisfied, merely opens the courthouse doors.") (internal quotation marks omitted). The law of negligence constantly requires juries to apply general principles of duty to particular factual scenarios. See Cline, 284 Va. at 113, 726 S.E.2d at 20 (Lemons, J., dissenting) (rejecting a landowner's specific duty to inspect trees in favor of a "simple application of ordinary negligence principles [and] imposing a duty of reasonable care upon all landowners"). This case is no different.

Similarly, RGR's argument that it owed no duty to Settle because RGR had no "actual or constructive knowledge" that the lumber stacks created a dangerous condition is without merit. Although RGR again uses nomenclature usually associated with premises liability, see Culpepper v. Neff, 204 Va. 800, 804, 134 S.E.2d 315, 318-19 (1964) ("[a]ctual or constructive knowledge on the part of the owner of a defect causing the injury is necessary to render him liable" to a business invitee), the proper question is one of foreseeability and pertains to what constitutes negligence, not to whether a duty to exercise ordinary care exists.

Actionable negligence requires that

> there must be a legal duty, a breach thereof and a consequent injury which could have been reasonably foreseen by the exercise of reasonable care and prudence, and where there is no breach or violation of a legal duty to take care for the safety of the person or property of another there can be no actionable negligence.

Atlantic Co. v. Morrisette, 198 Va. 332, 333, 94 S.E.2d 220, 221-22 (1956) (collecting cases); see also Virginia Elec. & Power Co. v. Savoy Constr. Co., 224 Va. 36, 46, 294 S.E.2d 811, 818 (1982) ("Foreseeability is relevant to a determination of proximate cause."); Maroulis v. Elliott, 207 Va. 503, 509-10, 151 S.E.2d 339, 344 (1966) ("Liability ensues when injury results from a risk or hazard which may be reasonably foreseen,

26

although the precise injury may not be foreseen."); <u>Limberg v. Lent</u>, 206 Va. 425, 426, 143 S.E.2d 872, 873 (1965) (noting that "the defendant did not fail to observe a duty owed . . . if it was not reasonably foreseeable that the defendant's actions might cause injury"); <u>Cleveland</u>, 179 Va. at 259, 18 S.E.2d at 915 ("[F]oreseeability of injury to one to whom duty is owed is of the very essence of negligence" and "[i]f injurious consequences are not foreseen as result of the conduct, then that conduct is not negligence.").

> Generally the test for negligence is whether the act or omission was done in the exercise of reasonable care. Whether reasonable care was exercised depends upon what a reasonably prudent person, with knowledge of the circumstances, ought to have foreseen in regard to the consequences of his act or omission. However, the precise nature of the consequences need not be foreseen. "It is enough if the act [or omission] is such that the party ought to have anticipated that it was liable to result in injury to others."

<u>Barnette v. Dickens</u>, 205 Va. 12, 16, 135 S.E. 109, 112 (1964) (quoting <u>Norfolk & W. Ry. Co. v. Whitehurst</u>, 125 Va. 260, 264, 99 S.E. 568, 569 (1919)). In sum, whether RGR breached its duty of ordinary care by stacking its lumber within Norfolk Southern's right-of-way because it was "reasonably foreseeable that [its] actions might cause injury," <u>Limberg</u>, 206 Va. at 426, 143 S.E.2d at 873, must be distinguished from the question whether a duty existed.

27

In accord with these principles, the jury was instructed that RGR was "not required to have anticipated or foreseen the precise injury or death that occurred, but it is sufficient that a reasonably prudent person would have anticipated or foreseen that some injury might probably result from the negligent act." RGR does not challenge this instruction.

Moreover, RGR's employee testified that the number of travelers using Kapp Valley Way and the railroad crossing had increased due to the construction project, and that the project had been ongoing for "quite some time." One of RGR's owners admitted that RGR knew the width of Norfolk Southern's right-of-way.[11] In addition, numerous witnesses testified that the lumber stacks blocked motorists' view of the railroad tracks. Given this testimony, the jury was entitled to infer that RGR breached its duty of reasonable care because a reasonably prudent person ought to have foreseen the consequences of stacking the lumber within Norfolk Southern's right-of-way at the point where Kapp Valley Way crosses the railroad tracks.

Fundamentally, RGR's position that it owed no duty to Settle would result in the wholesale rejection of a duty to exercise ordinary care in circumstances such as those here and would absolve one of liability for negligence no matter how

_____

[11] Norfolk Southern's right-of-way is also a matter of public record.

dangerous the conduct or foreseeable the injury. See Cleveland, 179 Va. at 259, 18 S.E.2d at 915; Dobbs, The Law of Torts § 253, at 9 ("Elevating a decision about particular facts to a no-duty rule will . . . exclude[e] liability not only in the particular case but also in others that are quite different on their facts and may call for a different result."). We decline RGR's invitation to make such a ruling. Therefore, we conclude that the circuit court did not err in holding that RGR had "the duty to exercise reasonable care in the use and maintenance of its property to prevent injury or death to others" and in so instructing the jury.

B. Contributory Negligence

RGR next contends that the circuit court erred in refusing to grant its motions to strike because the evidence established, as a matter of law, that Settle was contributorily negligent for failing to look and listen for the train. As the prevailing party in the trial court, Mrs. Settle is entitled to have the evidence and all inferences reasonably drawn from it viewed in the light most favorable to her. Norfolk S. Ry. Co. v. Rogers, 270 Va. 468, 478, 621 S.E.2d 59, 65 (2005). Armed with a jury verdict approved by the circuit court, Mrs. Settle occupies the "most favored position known to the law." Bennett, 282 Va. at 54, 710 S.E.2d at 739 (internal quotation marks omitted). The circuit court's judgment "is presumed to be correct, and we will

29

not set it aside unless the judgment is plainly wrong or without evidence to support it."  Id.

"Contributory negligence is an affirmative defense that must be proved according to an objective standard whether the plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances.  The essential concept of contributory negligence is carelessness."  Jenkins v. Pyles, 269 Va. 383, 388, 611 S.E.2d 404, 407 (2005) (citations omitted); accord Sawyer v. Comerci, 264 Va. 68, 74, 563 S.E.2d 748, 752 (2002); Ponirakis v. Choi, 262 Va. 119, 124, 546 S.E.2d 707, 710 (2001).  The defendant has the burden to prove contributory negligence by "the greater weight of the evidence." Sawyer, 264 Va. at 75, 563 S.E.2d at 752.

"[J]ust as a plaintiff is required to establish a prima facie case of negligence, a defendant who relies upon the defense of contributory negligence must establish a prima facie case of the plaintiff's contributory negligence."  Id. at 75, 563 S.E.2d at 753.  To do so, a defendant must show that the plaintiff was negligent and that such negligence was a proximate cause of the accident.  Rascher v. Friend, 279 Va. 370, 375, 689 S.E.2d 661, 664-65 (2010).  These are questions of fact to be decided by the factfinder unless "reasonable minds could not differ about what conclusion could be drawn from the evidence."

Jenkins, 269 Va. at 388-89, 611 S.E.2d at 407 (collecting cases).

On appeal, however, a defendant has a heavier burden. Wright v. Norfolk & W. Ry. Co., 245 Va. 160, 170, 427 S.E.2d 724, 729 (1993). A defendant "must show that there is no conflict in the evidence on contributory negligence, and that there is no direct and reasonable inference to be drawn from the evidence as a whole to sustain a conclusion that the plaintiff was free from contributory negligence." Id.

As Settle approached the Kapp Valley Way railroad crossing, he "had the duty to look and listen with reasonable care; he did not have the absolute duty to discover the presence of the train, unless by so looking and listening he was bound to have discovered it." Norfolk & W. Ry. Co. v. Greenfield, 219 Va. 122, 132, 244 S.E.2d 781, 786-87 (1978).[12] Reasonable care is the "degree of care a reasonably prudent person would exercise under the same or similar circumstances." Thomas v. Settle, 247 Va. 15, 21, 439 S.E.2d 360, 364 (1994). "Repeatedly, we have

---

[12] The jury was instructed that "[a] driver crossing train tracks has the duty to look and listen with reasonable care; he [does] not have the absolute duty to discover the presence of the train, unless by so looking and listening he was bound to have discovered it," and that a driver has the "duty to use ordinary care to look and listen effectively for an approaching train before crossing the tracks," even if the railroad failed to sound a horn, and "to stay off the tracks if he becomes aware of an approaching train." RGR does not challenge these instructions.

said that a railroad track is a proclamation of danger and the operator of a vehicle approaching a grade crossing 'is required to look and listen at a time and place when both looking and listening will be effective,' intelligently using both eyes and ears." Wright, 245 Va. at 171, 427 S.E.2d at 730 (quoting Norfolk & W. Ry. Co. v. Epling, 189 Va. 551, 557, 53 S.E.2d 817, 820 (1949)). Further, "[i]f a traveler drives blindly upon a crossing whether his view is obstructed or unobstructed, takes no precautions for his safety and is injured, his negligence will preclude any recovery on his part." Southern Ry. Co. v. Campbell, 172 Va. 311, 318, 1 S.E.2d 255, 258 (1939). "A traveler . . . must always exercise care proportioned to the known danger, and this care must be such as one who knows the danger and of the prior right of passage [of the moving train] would be expected to exercise." Id. at 317, 1 S.E.2d at 257.

In numerous cases involving vehicular-train collisions, we have considered whether a driver was contributorily negligent. For example, in Wright, the plaintiffs' ward was an experienced dump truck driver and was "thoroughly familiar" with a particular public railroad crossing. 245 Va. at 171, 427 S.E.2d at 730. The driver was aware that he needed to rely on his senses of sight and sound to detect an approaching train because there were no automatic warning devices at the crossing. Id. He further knew of "the limitations to sight and hearing" due to

32

the configuration of his truck's cab and the angle of the street relative to the railroad tracks.  Id.  According to testimony, however, he typically drove with his air conditioning and radio on in the cab.  Id. at 164, 427 S.E.2d at 726.  The driver was struck when he "drove his truck from a stopped position of safety onto the crossing directly in front of the train when its engine was less than ten feet away."  Id. at 171, 427 S.E.2d at 730.

The plaintiffs' experts testified that it was "impossible" for the plaintiff to have seen or heard the train and that the crossing was "not reasonably safe" and "ultrahazardous."  Id. at 164-65, 427 S.E.2d at 726 (internal quotation marks omitted).  Nevertheless, the trial court concluded that the driver was contributorily negligent as a matter of law.  Id. at 166, 427 S.E.2d at 727.  We agreed.  Noting that he "was not forced to approach the crossing with his right window closed, and presumably with his air conditioning and radio operating," we said that the driver could have taken numerous steps to avoid the collision, including "open[ing] his window after his truck had been loaded and before [leaving] the quarry [or] making a wider right turn, thus bringing his truck to an attitude with relation to the crossing that he could see clearly north along the track."  Id. at 171-72, 427 S.E.2d at 730.  Having failed to do so, "the only conclusion to be drawn from the whole evidence"

was that the driver "was the architect of his own misfortune." Id. at 172, 427 S.E.2d at 730; see also Greenfield, 219 Va. at 133, 244 S.E.2d at 787 (identifying the train's "continuous signals" and actions the decedent could have taken to avoid the crash).

Similarly, we held that the decedent was contributorily negligent as a matter of law in Norfolk & W. Ry. Co. v. Benton, 160 Va. 633, 169 S.E. 560 (1933). There, the decedent was traveling in his automobile at 10-15 miles per hour when he drove his vehicle onto a railroad crossing and was struck by a train, resulting in his death. Id. at 636, 169 S.E. at 561. The train was partially, but only briefly, obstructed by train cars standing on a side track, and "[a] clear view . . . could be had as the crossing was approached because one's vision of the train would have been unobstructed for a considerable distance beyond the cars" on the side track. Id. Although a passenger in the automobile testified that a flagman from the railway company waved the decedent onto the tracks, the Court held that such action should have indicated the proximity of the train, which was in plain view of the decedent. Id. at 642-43, 169 S.E.2d at 564. The Court concluded that the plaintiff "fail[ed] to take any precaution for his own safety." Id. at 642, 169 S.E.2d at 563.

In contrast, the facts and circumstances in Kimball v. Friend, 95 Va. 125, 27 S.E. 901 (1897), were such that reasonable persons could differ as to whether the decedent was guilty of contributory negligence. The decedent, traveling on a bicycle, was struck and killed by a train as he crossed railroad tracks that passed through a narrow cut in the land. Id. at 136-37, 27 S.E. at 902-03. The road on which the decedent was traveling narrowed at the tracks, with "the view of the railroad track on either side of the crossing . . . practically shut off by the sides of the cut to a traveler . . . until he got to the crossing." Id. at 134, 27 S.E. at 902. The tracks in the direction from which the train came, however, were visible in several places from the road on which the decedent traveled before reaching the narrow cut that led to the crossing. Id. at 137, 27 S.E. at 903. The warning gong and lights failed to indicate the presence of the train, and two witnesses walking in the same direction toward the crossing said they did not hear the approach of the train until it struck the decedent. Id.

Although the decedent had a duty to exercise reasonable care to avoid putting himself into a position in which he could not escape the collision, the fact that he failed to do so was

> not conclusive evidence that he was there by his own negligence. He may have been there in consequence of the defendants' negligence . . . . Whether he used due care to ascertain if a train was approaching

35

> depended upon inferences from facts to be
> found by the jury. The manner in which he
> approached the track; the speed at which he
> was travelling; the obstructions to a view
> of the track on which the engine was
> approaching; the negligence of the
> defendants . . . were among the facts to be
> found by the jury, and from which facts in
> connection with all the other circumstances
> and facts of the case the main fact of due
> care or negligence on the part of the
> deceased was to be found.

Id. at 138-39, 27 S.E. at 903.

The Court also held that the jury was entitled to "infer that the deceased had placed some reliance upon the fact that the electric gong failed to sound as the engine approached the crossing, and was thereby misled." Id. at 140, 27 S.E. at 903-04.

> [W]hile courts and text-writers differ as to
> the degree of reliance that may be placed
> upon the invitation which an open gate or
> silent gong gives to the traveler to cross,
> they generally, if not universally, hold
> that the same degree of care and caution is
> not required of him, as if there was no such
> invitation.

Id. at 140, 27 S.E. at 904; see also Benton, 160 Va. at 641, 169 S.E. at 563 ("[T]he circumstances under which, and to what extent, [a traveler] may relax his vigilance depends on the surroundings."). "The question of negligence in such a case," the Court concluded, "is peculiarly one for the consideration of the jury." Kimball, 95 Va. at 140, 27 S.E. at 904; see also Seaboard Air Line Ry. v. Abernathy, 121 Va. 173, 180, 92 S.E.

36

913, 916 (1917) (holding that where plaintiff's vision was obstructed at a crossing, it would have been error to decide "as a matter of law that the plaintiff should, within the space of less than eight feet, six inches, have been able, while his car was slowly moving, to look in both directions and stop in time to have avoided the accident").

In Southern Railway Co. v. Bryant, 95 Va. 212, 28 S.E. 183 (1897), the Court noted the importance of a traveler's hearing faculty when his or her view is obstructed. There, the Court held the defendant railway company failed to give due warning of the train's approach to a crossing on a public highway. Id. at 218, 28 S.E. at 185. In addition, the decedent, "on account of the obstruction of the view [of the tracks] by [a] hill, was unable to see the track . . . until he got to it." Id. at 219-20, 28 S.E. at 185. As a result, the decedent "had to rely on the faculty of hearing" and without the train's horn being sounded, "there was . . . nothing to warn him the train was near." Id. at 220, 28 S.E. at 185. Under these circumstances, the Court held that it "cannot be inferred as a matter of law" that because the decedent "drove upon the track without stopping, [that] he did not listen." Id. at 221, 28 S.E. at 185.

Recognizing the general rule that a person approaching a railroad crossing must exercise ordinary care by looking and

37

listening and keeping off the track if warned of a nearby train, the Court, however, stated that the general rule "is not inflexible, nor wholly without exception." Id. at 219, 28 S.E. at 185. We explained that

> [i]t would be unreasonable to require a
> traveler, upon approaching a railroad
> crossing over a highway to look, when, by
> reason of the nature of the ground or other
> obstructions, he could not see; in other
> words, when compliance with the general rule
> would be impracticable or unavailing. Where
> the view of the track is obstructed, and the
> railroad company has failed to give notice
> of the approach of its train to a crossing
> upon the highway, and a person in attempting
> to go across the track, not being able to
> see the train on account of obstructions,
> and being obliged to act upon his judgment
> at the time of crossing, is injured, the
> propriety of his going upon the track under
> such circumstances is not a question of law
> to be decided by the court, but a matter of
> fact to be determined by the jury.

Id.

Similarly, in Campbell, obstructions prevented the plaintiff from having a clear view of the railroad tracks for trains approaching from the right until "the front of [his] truck was quite near the rails." 172 Va. at 315, 1 S.E.2d at 256. The automatic warning gong with a red light in its center was flashing when the train moved forward over the crossing and stopped when the train advanced beyond the crossing. Id. After lowering his window, looking, and listening, the plaintiff believed that the train had passed and drove slowly onto the

crossing, whereupon his truck was struck by the backward movement of the train that had just crossed.  Id.

The Court concluded that the plaintiff's "conduct on approaching the crossing under the surrounding conditions, measured by what a prudent man in the exercise of ordinary care would have done under like circumstances, was at least such as would cause fair-minded men to differ."  Id. at 319, 1 S.E.2d at 258.

> "[T]he question, we think, was for the jury whether reasonable caution forbade his going forward in reliance on the sense of hearing, unaided by that of sight.  No doubt it was his duty to look along the track from his seat, if looking would avail to warn him of the danger.  This does not mean, however, that if vision was cut off by obstacles, there was negligence in going on, any more than there would have been in trusting to his ears if vision had been cut off by darkness of the night."

Id. at 323, 1 S.E.2d at 260 (quoting Pokora v. Wabash Ry. Co., 292 U.S. 98, 101 (1934)).  The Court further stated that if a driver's "view is obstructed and he exercises a reasonable degree of caution, drives slowly, looks and listens for trains but sees none, proceeds in a cautious manner over the tracks and is injured, the question of whether he was negligent under all of the circumstances must be for the jury."  Id. at 322, 1 S.E.2d at 259; see Southern Ry. Co. v. Aldridge, 101 Va. 142, 149, 43 S.E. 333, 335 (1903) ("It is true that if he had stopped

39

or paused the accident might not have occurred, but we do not feel warranted in saying that, as matter of law, his failure to stop made a case of contributory negligence so plain as to justify the court in withdrawing it from the consideration of the jury.").

In the case now before us, the evidence, viewed in the light most favorable to Mrs. Settle, showed that trains typically approached from the east, opposite from the direction of the train that struck Settle's truck. Based on Settle's familiarity with the crossing due to his frequent trips to the construction project that had been ongoing for some time, the jury could have inferred that Settle too was aware of the usual direction in which the trains traveled at that location. Settle's familiarity with the crossing likewise supports the inference that he knew RGR's lumber stacks blocked his view of the railroad tracks to the right as he traveled south on Kapp Valley Way. Several buildings on RGR's leased property, according to Humphreys, also obstructed Settle's line of sight as he descended the hill to the crossing. In such a scenario, Settle was forced to rely on his hearing. See Bryant, 95 Va. at 220, 28 S.E. at 185.

Numerous witnesses, however, stated that they never heard the train's horn between the Route 15 and Kapp Valley Way crossings, and several affirmatively stated that the train did

40

not sound its horn.  The train's conductor and engineer were the only witnesses who testified to the contrary, with the engineer stating that not only did he blow the horn after the Route 15 crossing, but also sounded the horn constantly until the moment of impact.  The jury, however, was entitled to reject the testimony of the conductor and engineer.  See Elliott v. Commonwealth, 277 Va. 457, 462, 675 S.E.2d 178, 181 (2009) ("The credibility of witnesses and the weight accorded the evidence are matters solely for the fact finder.").  The "same degree of care and caution is not required" when an open gate, silent gong, or absence of a train's horn invites a driver to proceed across railroad tracks. Campbell, 172 Va. at 321, 1 S.E.2d at 259 (internal quotation marks omitted) (collecting authorities).  The jury also heard that Settle's ability to hear noises outside the cab of his truck were diminished by the sounds inside the cab while driving.  "In such circumstances the question . . . was for the jury whether reasonable caution forbade his going forward in reliance on the sense of hearing, unaided by that of sight."  Id. at 323, 1 S.E.2d at 260.

The evidence also showed that because Kapp Valley Way narrowed at the crossing to single-vehicle width, drivers typically took turns crossing the railroad tracks and waved each other across.  As Settle descended the hill to the crossing prior to his truck being hit by the train, Mendosa and Bonilla

41

both waved their arms out their windows.  Construing the evidence in the light most favorable to Mrs. Settle, the jury could have concluded that because RGR's lumber stacks impaired Settle's ability to see the approaching train, he viewed Mendosa's and Bonilla's waving as an indication that he could proceed across the railroad tracks.

Unlike the plaintiffs in Wright and Greenfield, reasonable care did not require Settle to undertake any particular action to avoid the collision.  See Wright, 245 Va. at 171-72, 427 S.E.2d at 730 (identifying numerous acts the decedent could have taken to avoid causing the accident); Greenfield, 219 Va. at 133, 244 S.E.2d at 787 (same).  RGR argues, however, that Settle's failure to look when he crossed the railroad tracks conclusively establishes his contributory negligence.  Although the train's conductor and engineer both testified that Settle was looking straight ahead, their accounts are inconsistent as to whether they saw Settle as soon as he emerged from behind the lumber stacks or as he entered the crossing.  That Settle was looking straight ahead as he entered the crossing does not speak to whether he looked as he emerged from behind the lumber stacks.

More importantly, Settle's duty to look and listen cannot be divorced from his actions as he approached the crossing and the surrounding circumstances.  The witnesses agreed that Settle

42

was traveling slowly, no more than five miles per hour, as he approached the railroad crossing. At the point that Settle could see the train after emerging from behind the lumber stacks, the front of his truck would have been approximately 12.5 feet from the edge of the rails. If Settle was traveling at 5 miles per hour, or 7.33 feet per second, and had the normal human reaction time of 1.5 seconds, of which the circuit court took judicial notice, Settle's truck would have traveled 11 feet in the time it took him to become aware of the train and apply the truck's brakes. With the weight of his truck, it would have taken an additional 10 feet to stop the truck once he applied the brakes, carrying him well past the limited space in which he had to stop before reaching the rails.

As in Bryant, "[i]t cannot be inferred as a matter of law . . . that because [Settle] drove upon the track without stopping, he did not [look]." 95 Va. at 221, 28 S.E. at 185. But even if he in fact did not look, that failure was not contributory negligence as a matter of law because the jury could have inferred that, based on the circumstances, looking would have been futile due to the location of RGR's lumber stacks within Norfolk Southern's right-of-way. Thus, RGR's contention that Settle is guilty of contributory negligence as a matter of law is essentially an argument that he was legally required to stop in order to look and listen. But this has never been the law.

43

> It has been said in numerous cases that the railroad track itself was a signal of danger, and imposed upon one approaching it the duty to look and listen, but it has in no case been held that it was his duty to stop in order to look and listen, or that it was his duty when in a vehicle to get out in order to look and listen.

Aldridge, 101 Va. at 146, 43 S.E. at 334. No doubt if Settle had stopped or paused, the accident might not have occurred. But as in Aldridge, "we do not feel warranted in saying that, as [a] matter of law, his failure to stop made a case of contributory negligence so plain as to justify the court in withdrawing it from the consideration of the jury." Id. at 149, 43 S.E. at 335 (collecting cases).

Furthermore, stopping in order to look and listen would have placed Settle in peril from a train approaching from the east, the opposite direction from which the train approached when it struck his truck. As Settle approached the crossing, his sightline to the east was 600 feet, a distance covered in only nine seconds by a train traveling 45 miles per hour, the speed of the train in this case. Settle's truck was 30 feet long, the lumber pile was 12.5 feet from the railroad tracks, and the track itself was five feet wide. According to Weston, Settle's truck accelerated from a standstill at about 1-2 miles per hour, a speed incapable of traversing the 47.5 foot distance to clear the tracks and avoid a collision with a train

44

approaching from the east, the direction from which most trains traveled at that crossing.

Whether Settle, as a matter of law, failed to exercise reasonable care under the circumstances, requires "that there [be] no conflict in the evidence on contributory negligence, and that there [be] no direct and reasonable inference to be drawn from the evidence as a whole to sustain a conclusion that [Settle] was free from contributory negligence." Wright, 245 Va. at 170, 427 S.E.2d at 729. Contrary to RGR's argument, there was indeed conflicting evidence pertaining to contributory negligence, and it was for the jury to determine the credibility of the witnesses and to decide which inferences to draw from the facts. Settle's "conduct on approaching the crossing under the surrounding conditions, measured by what a prudent man in the exercise of ordinary care would have done under like circumstances, was at least such as would cause fair-minded men to differ." Campbell, 172 Va. at 319, 1 S.E.2d at 258; Jenkins, 269 Va. at 389, 611 S.E.2d at 407 (contributory negligence is an issue of law "only when reasonable minds could not differ about what conclusion could be drawn from the evidence").

In conclusion, we reiterate what the Court said many years ago in Kimball. Settle had a duty to exercise reasonable care to avoid putting himself into a position in which he could not

45

escape the collision.  Nevertheless, the fact that he failed to avoid the collision is

> not conclusive evidence that he was there by his own negligence.  He may have been there in consequence of the defendants' negligence . . . .  Whether he used due care to ascertain if a train was approaching depended upon inferences from facts to be found by the jury. The manner in which he approached the track; the speed at which he was travelling; the obstructions to a view of the track on which the engine was approaching; [and] the negligence of the defendants . . . were among the facts to be found by the jury.

95 Va. at 138-39, 27 S.E. at 903.

Therefore, we conclude that the circuit court did not err in refusing to find Settle contributorily negligent as a matter of law.  The court's judgment on this issue was not "plainly wrong or without evidence to support it."  Code § 8.01-680.

C.  Proximate Causation

RGR argues that its lumber stacks were not the proximate cause of the collision between Settle's truck and the train. RGR contends, instead, that if Settle had exercised the necessary diligence and care when approaching the railroad crossing, the collision would not have occurred.

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred."  Ford Motor Co. v.

46

Boomer, 285 Va. 141, 150, 736 S.E.2d 724, 728 (2013). Generally, the issue of proximate causation is a question of fact to be resolved by a jury. Jenkins v. Payne, 251 Va. 122, 128, 465 S.E.2d 795, 799 (1996). However, when reasonable people cannot differ, the issue becomes a question of law for the court to decide. Id.

Based on the facts already set forth, the jury was entitled to infer that without the sight obstruction created by the location and height of the lumber stacks, Settle would have been able to see the approaching train as he traveled toward the crossing. In other words, if the lumber stacks had not been situated as they were on the day of the accident, within Norfolk Southern's right-of-way that was designed to maintain clear sight lines for motorists and the train crew, Settle would have been in position to look for an approaching train "'at a time and place'" when looking would have been effective. Wright, 245 Va. at 171, 427 S.E.2d at 730 (quoting Epling, 189 Va. at 557, 53 S.E.2d at 820).

Contrary to RGR's argument, our decision in Sugarland Run Homeowners Association v. Halfmann, 260 Va. 366, 535 S.E.2d 469 (2000), is distinguishable and not dispositive on the issue of proximate causation. There, a vehicle struck an eight-year old boy as he rode his bicycle from a private pathway onto a public street. Id. at 370-71, 535 S.E.2d at 471-72. The issue on

47

appeal was whether the alleged defects in the design of the pathway and its intersection with the public street were a proximate cause of the accident.  Id. at 371, 535 S.E.2d at 472. Unlike the case before us, the intersection and public street were "clearly visible" to anyone traveling on the pathway, and the case was "not one where [the boy] had to ride his bicycle into the edge of [the street] and look around [certain obstacles] in order to determine whether any vehicle was approaching."  Id. at 373-74, 535 S.E.2d at 473.

In resolving the question of proximate causation, "'[e]ach case necessarily must be decided upon its own facts and circumstances.'"  Banks v. City of Richmond, 232 Va. 130, 135, 348 S.E.2d 280, 283 (1986) (quoting Huffman v. Sorenson, 194 Va. 932, 937, 76 S.E.2d 183, 187 (1953)).  The evidence in this case is sufficient to support the conclusion that Settle's view of the approaching train was obstructed by the lumber stacks and that the location of the lumber stacks was therefore a proximate cause of the collision.  We cannot say as a matter of law that reasonable people could not differ on this issue.  Jenkins, 251 Va. at 128, 465 S.E.2d at 799.  Thus, the circuit court did not err in refusing to grant RGR's motions to strike and set aside the verdict on the issue of proximate causation.

D.  Offset of Settlement Amount

Finally, RGR challenges the circuit court's decision to

48

calculate the offset under Code § 8.01-35.1 by adding the prejudgment interest awarded by the jury to the $2.5 million award before deducting the $500,000 settlement between Mrs. Settle and Norfolk Southern. RGR argues that in Upper Occoquan Sewage Authority v. Blake Construction Company, 275 Va. 41, 655 S.E.2d 10 (2008), we held that the phrase "principal sum awarded" as used in Code § 8.01-382 does not include prejudgment interest and that post-judgment interest therefore may not accrue on prejudgment interest. RGR asserts that we should now construe Code § 8.01-35.1 "in harmony" with Code § 8.01-382 and prevent a double recovery by similarly limiting the phrase "amount recovered" found in Code § 8.01-35.1 to include only the principal amount awarded, in this case the jury award of $2.5 million.[13]

In response, Mrs. Settle argues that the phrase "amount recovered" in Code § 8.01-35.1 "unmistakeably" means the amount of damages awarded plus any prejudgment interest. This is so, according to Mrs. Settle, because prejudgment interest is

---

[13] Part of RGR's argument is based on the false premise that the circuit court imposed post-judgment interest on the combined amount of the principal award and the prejudgment interest. That assertion is incorrect. The circuit court expressly stated that post-judgment interest was awarded solely on the principal of $2.5 million. See Upper Occoquan, 275 Va. at 67, 655 S.E.2d at 25 (holding that "the 'principal sum awarded' as contemplated by Code § 8.01-382 is that element of the plaintiff's damages that compensates the plaintiff for the actual harm sustained, but not any prejudgment interest on those damages").

"normally designed to make the plaintiff whole and is part of the actual damages sought to be recovered." Shepard v. Capitol Foundry of Va., 262 Va. 715, 722, 554 S.E.2d 72, 76 (2001) (internal quotation marks omitted).[14] Thus, she asserts that the term "amount recovered" cannot be interpreted to mean only the "principal sum awarded" as used in Code § 8.01-382.

The interpretation of these statutes is a pure question of law reviewed de novo. Torloni v. Commonwealth, 274 Va. 261, 267, 645 S.E.2d 487, 490 (2007). When a statute is clear and unambiguous, we apply its plain meaning. Id.

Code § 8.01-35.1(A)(1) states that

> [w]hen a release or a covenant not to sue is given in good faith to one of two or more persons liable for the same injury to a person or property, or the same wrongful death[,] [i]t shall not discharge any other person from liability for the injury, property damage or wrongful death unless its terms so provide; but any amount recovered against the other person or any one of them shall be reduced by any amount stipulated by the covenant or the release, or in the amount of the consideration paid for it, whichever is the greater.

(Emphasis added.) We have previously interpreted the "clear and unambiguous language of Code § 8.01-35.1" to effectuate three

---

[14] In contrast to prejudgment interest, "'post-judgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due.'" Upper Occoquan, 275 Va. at 63-64, 655 S.E.2d at 23 (quoting Dairyland Ins. Co. v. Douthat, 248 Va. 627, 631-32, 449 S.E.2d 799, 801 (1994)).

primary purposes: "preserv[ing] the right of action against the non-settling tortfeasor, provid[ing] that 'any amount recovered' from the non-settling tortfeasor must 'be reduced' by the amount received from the settling tortfeasor, and require[ing] the court to consider the amount paid by the settling tortfeasor in determining the amount for which judgment should be entered." Torloni, 274 Va. at 267-68, 645 S.E.2d at 491.

In relevant part, Code § 8.01-382 states that "[i]n any . . . action at law . . . the final order, verdict of the jury, or if no jury the judgment . . . of the court, may provide for interest on any principal sum awarded." (Emphasis added.) As RGR argues, we have held that the phrase "principal sum awarded" means "that element of the plaintiff's damages that compensates the plaintiff for the actual harm sustained, but not any prejudgment interest on those damages that the trier of fact might also award." Upper Occoquan, 275 Va. at 67, 655 S.E.2d at 25.

The two statutes obviously use different terms, i.e., "any amount recovered" and "principal sum awarded," but the two terms are not in the same legislative act[15] and the two statutes, Code §§ 8.01-35.1 and -382, address different subjects. Cf. Zinone v. Lee's Crossing Homeowners Ass'n, 282 Va. 330, 337, 714 S.E.2d

---

[15] See 1979 Acts ch. 697 and 1964 Acts. ch. 219, respectively.

922, 925 (2011) ("[W]hen the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional."); Industrial Dev. Auth. of the City of Roanoke v. Board of Supervisors, 263 Va. 349, 353, 559 S.E.2d 621, 623 (2002) ("When the General Assembly uses two different terms in the same act, those terms are presumed to have distinct and different meanings.").

In construing the statutes, we conclude that the purposes underlying Code § 8.01-35.1 require that the $500,000 settlement amount be subtracted from the $2.5 million damage award before calculating the prejudgment interest also awarded by the jury. Code § 8.01-35.1 apportions liability among joint tortfeasors when one tortfeasor settles with a plaintiff and another one does not. By requiring that the "amount recovered" against a non-settling tortfeasor be reduced by the amount stipulated in the covenant or release, the General Assembly clearly intended that joint tortfeasors share the cost of liability for the same damage caused by their tortious conduct. Sharing this cost entitles the non-settling tortfeasor to an offset of any settlement between the settling tortfeasor and the plaintiff. To construe § 8.01-35.1 as the circuit court did negates that benefit by requiring the non-settling tortfeasor to pay interest

52

on the offset amount, i.e., money that tortfeasor does not owe. In other words, the circuit court required RGR to pay interest on the $500,000 paid by Norfolk Southern in settlement with Mrs. Settle.  In our view, that method of calculating the offset does not effectuate the purposes of Code § 8.01-35.1.

We therefore conclude that the circuit court erred in its determination of the total sum from which the settlement amount would be deducted.

### III.  CONCLUSION

For these reasons, we will affirm the circuit court's judgment except with regard to its calculation of the offset pursuant to Code § 8.01-35.1.  On that issue, we will reverse the circuit court's judgment and remand for further proceedings consistent with this opinion.

<u>Affirmed in part, reversed in part, and remanded</u>.



JUSTICE McCLANAHAN, with whom JUSTICE LEMONS and JUSTICE GOODWYN join, dissenting.

I dissent from the Court's judgment because I would hold that RGR owed no legal duty to Settle under Virginia law as it existed before today. Instead of analyzing the specific duty RGR owed to Settle in accordance with our prior decisions carefully defining and limiting the duty owed in negligence cases, the Court imposes an abstract duty to mankind generally, based on general maxims. In my view, this newly-created, ever-present duty overturns decades of entrenched and long-accepted Virginia law, requires owners of property and occupants of land to use their property with due care given the whole world in all instances, and effectively removes duty as an element of all property and land-use negligence actions.

In addition to my disagreement with the Court's holding on the duty owed by RGR to Settle, I believe that Settle was contributorily negligent as a matter of law.

I. Duty Owed by RGR to Settle Under Virginia Precedent

Application of established Virginia precedent does not support the recognition of a duty owed by RGR to Settle.

At the time of the accident, Settle was traveling on Kapp Valley Way, a private road located on the premises owned by Wolf

Realty, which lay adjacent to the premises occupied by RGR.[1] Norfolk Southern allowed Wolf Realty's private road to cross its right-of-way and tracks. Mrs. Settle claims that the lumber stack located on RGR's premises and the railroad's right-of-way property obstructed Settle's view of Norfolk Southern's eastbound train as he approached the railroad crossing.

RGR operated a business offloading lumber from traincars and loading it onto tractor trailers. Norfolk Southern was aware of the lumber that was offloaded from its trains, and that its right-of-way was used for that purpose. In her complaint, Mrs. Settle alleged that Norfolk Southern was fully aware of the sight obstructions at Kapp Valley Crossing created by RGR's stacked lumber. Mrs. Settle also alleged that "Norfolk Southern employees also conducted mandatory inspections of the track at Kapp Valley Crossing twice per week for a period of at least four months during which they could not help but observe the sight obstruction created by the lumber stacked" on Norfolk Southern's property. The railroad's right-of-way adjoining Kapp Valley Way was not physically designated, and the railroad does

---

[1] Wolf Realty owned the land along the south side of the railroad tracks on both sides of Kapp Valley Way. Wolf Realty also owned the land on both sides of Kapp Valley Way along the north side of the railroad tracks.

On the north side of the tracks, Wolf Realty's land was bordered on the west by the parcel of land owned by Rose Investments and leased by RGR.

not have a standard right-of-way width for a private railroad crossing. An employee of Norfolk Southern testified that he had inspected Norfolk Southern's property regularly, had observed RGR's lumber and was not concerned with its placement. He further testified that he had observed the lumber prior to the accident and it did not cause him any concern for the motoring public at the crossing.

As indicated by the majority, in her fourth amended complaint, Mrs. Settle alleged that RGR, as well as the other named defendants, "owed a duty of reasonable due care" to Settle "in the care, maintenance, upkeep [and] inspection" of both Norfolk Southern's right-of-way and the property upon which the lumber was stacked. According to the complaint, that duty of care included, but was not limited to, "keeping them [sic] premises free from defects, dangerous conditions, and obstructions." Mrs. Settle further alleged that the defendants "breached their duties of reasonable care . . . by failing to inspect, upkeep and maintain the property," and in so doing, among other things, "allowing . . . stacks of lumber to exist such that they block the view of motorists approaching the Kapp Valley Crossing."

Because Mrs. Settle asserts that RGR owed a duty of reasonable care to keep its "premises free from defects, dangerous conditions, and obstructions," the issue of duty

57

necessarily implicates the liability of RGR for conditions existing on its land to persons using the private road located on Wolf Realty's land.  Although RGR's lumber pile extended seven feet onto Norfolk Southern's property, Mrs. Settle contends and reiterated during oral argument that under her theory of the case, an occupant of land could be potentially liable for a sight obstruction existing solely on its land, and that RGR could be held liable for the obstruction created by its lumber without regard to its occupancy of the premises where the lumber was placed.  Thus, the dispositive issue in this appeal is whether owners and occupants of land have a legal duty to maintain their property and that of adjoining landowners so as to refrain from obstructing the view of drivers on adjacent land.[2]

---

[2] Determining this issue is not "[e]levating a decision about particular facts to a no-duty rule" or "attempt[ing] to transform factual determinations about breach and proximate causation to be resolved by the factfinder into a legal determination" as the majority suggests.  The "no-duty" rule is properly invoked "when all cases they cover fall substantially within the reason that frees the defendant of responsibility for his fault."  2 Dan B. Dobbs, The Law of Torts § 253 at 9 (2d ed. 2011).  Therefore, just as this Court has properly determined whether owners or occupants of land owe a duty to protect travelers on an adjoining public roadway from natural conditions on their land, see Cline v. Dunlora South, LLC, 284 Va. 102, 110, 726 S.E.2d 14, 18 (2012), it is appropriate to determine whether owners or occupants of land owe a duty to maintain sightlines on their land for travelers on adjacent private lands.

Common law imposes a duty of inspection, maintenance and upkeep of property on the individual who possesses the property. See Volpe v. City of Lexington, 281 Va. 630, 636, 708 S.E.2d 824, 827 (2011) ("In Virginia, a landowner owes an invitee 'the duty of using ordinary care to maintain its premises in a reasonably safe condition and to warn . . . of any hidden dangers.'") (citation omitted); see also Winn-Dixie Stores, Inc. v. Parker, 240 Va. 180, 182, 396 S.E.2d 649, 650 (1990) (describing the duty to an invitee as a duty to have the premises in a reasonably safe condition). There is no common law duty imposed upon a neighbor concerning the maintenance and/or inspection and upkeep of adjoining property. Thus, Norfolk Southern may be responsible for any alleged failure to maintain its right-of-way and any duty it owes to Settle because of its agreement which allowed Kapp Valley Way to cross its property and tracks. Likewise, RGR may be responsible for the maintenance and upkeep of its property to the extent it owes a duty to a traveler on an adjoining roadway, such as Mr. Settle.

We have not previously recognized a duty owed by an owner or occupant of land to maintain the premises so as not to obstruct the view of an individual using a private road on adjacent premises. With regard to premises abutting a public roadway, we have held that occupants of land owe a duty to travelers of the roadway to exercise ordinary care to prevent

59

artificial conditions originating from the premises from escaping the boundaries of land onto the roadway. The source of this duty springs from the right of travelers to use those portions of roadways "which [have] been dedicated to . . . public travel." Price v. Travis, 149 Va. 536, 542, 140 S.E. 644, 646 (1927) (quoting Appalachian Power Co. v. Wilson, 142 Va. 468, 473 129 S.E. 277, 278 (1925)). This principle dictates that "[n]o private person has a right to place any obstruction which interferes with this right on any part of the highway within its exterior limits." Id. (quoting Dickey v. Maine Telegraph Co., 46 Me. 483, 485 (1859)) (emphasis added). Thus, the duty to travelers on a public roadway exists only with regard to conditions that encroach upon the roadway itself.[3]

For example, in Price, we noted two specific instances in which an occupant of land might be liable for artificial conditions affecting a public road. First, we stated that an owner or occupant of land may be liable for "build[ing] such things under the surface of the sidewalk or street, as areaways, hatchways, coal holes, etc., that are inherently dangerous unless properly protected by safe guards and covers; that the owner must at all times maintain in such condition as to insure the safety of travelers upon the street." 149 Va. at 543, 140

---

[3] A landowner has no duty "to protect travelers on an adjoining public roadway from natural conditions on his or her land." Cline, 284 Va. at 110, 726 S.E.2d at 18.

60

S.E. at 646. Second, we noted that an owner or occupant of land may face liability for suspending objects "over or near to the street - such as awnings, poles, cornices, window shutters, etc. - that falling onto a street or sidewalk might thereby injure a traveler." Id. Similarly, we have held that owners or occupants of land have a duty to exercise ordinary care in keeping domestic animals off public highways. Stout v. Bartholomew, 261 Va. 547, 557, 544 S.E.2d 653, 658 (2001); Wilkins v. Sibley, 205 Va. 171, 173, 135 S.E.2d 765, 766 (1964); Rice v. Turner, 191 Va. 601, 605, 62 S.E.2d 24, 26 (1950).[4]

_____

[4] Outside the context of public roadways, our precedent likewise does not support the imposition of a duty owed by RGR to Settle. We have recognized several situations in which a landowner or possessor of land has a duty to protect against injury to property on adjacent land. However, in each case, the condition at issue physically intruded upon the adjoining parcel that was harmed. See e.g., Fancher v. Fagella, 274 Va. 549, 555-56, 650 S.E.2d 519, 522 (2007) (holding that landowners owe a duty to protect against actual or imminent harm to property caused by encroaching branches or roots); Third Buckingham Community, Inc. v. Anderson, 178 Va. 478, 486, 17 S.E.2d 433, 436 (1941) (holding that an "owner of land cannot collect . . . water into an artificial channel or volume and pour it upon the land of another, to his injury") (internal quotation marks omitted); Akers v. Mathieson Alkali Works, 151 Va. 1, 17-18, 144 S.E. 492, 495 (1928) (holding that a landowner has a duty to prevent injurious substances from escaping from its premises and damaging the property of another); Collins v. George, 102 Va. 509, 516, 46 S.E. 684, 686 (1904) (holding that "persons in the lawful use of fire" owe a duty of ordinary care to prevent it from spreading and injuring the property of others). The lumber stack located on RGR's premises did not encroach upon Wolf Realty's premises or Kapp Valley Way.

Our precedent establishes, therefore, that the duty owed by owners and occupants of land to travelers on <u>abutting public roadways</u> derives from the right of travelers to use that portion of the highway that has been dedicated to public travel and extends only to artificial conditions <u>intruding on the exterior limits of the roadway</u>. We have never recognized that an owner or occupant of land has a duty to protect travelers on public roadways from potential dangers caused by artificial conditions wholly contained <u>outside</u> the exterior limits of the roadway, including artificial conditions on adjacent land that may obstruct a traveler's view. Thus, even if we were to recognize that RGR owed the same duty of care to Settle, a traveler on a private road located on private property, that it would owe to a traveler on an abutting public highway, our precedent does not support the existence of a duty owed by RGR to maintain its premises so as to keep it free of sight obstructions for the users of Kapp Valley Way.

In fact, I believe it is unreasonable to impose a burden upon landowners to maintain sightlines for private roads on neighboring properties. Such a burden would place landowners at the mercy of the neighbor's choice of where to locate any such private roads and require landowners to calculate sightlines for any activity undertaken whether it involves structures, crops, or foliage.

62

This view is in accord with that of numerous state courts that have refused to impose such a duty even with regard to public rights-of-way.  See, e.g., Coburn v. City of Tucson, 691 P.2d 1078, 1080-81 (Ariz. 1984) (reaffirming principle that common law does not place the possessor land abutting public highways under any obligation to use or refrain from using his land so as to protect members of the traveling public on abutting streets); Rodgers v. Ray, 457 P.2d 281, 283-84 (Ariz. App. 1969) (no duty owed by owner or possessor of land abutting public highway to refrain from using land so as to obstruct view for those using highway); Driggers v. Locke, 913 S.W.2d 269, 271-74 (Ark. 1996)(no duty owed by landowner to maintain holly bushes so as not to obscure vision of motorists); Williams v. Davis, 974 So.2d 1052, 1062-63 (Fla. 2007) (no duty owed by landowner to motorists on abutting roadways as to maintenance of foliage unless it extends into the public right-of-way); Adame v. Munoz, 678 N.E.2d 26 (Ill. App. Ct. 1997) (no duty owed by landowners to maintain property so as not to obstruct view of travelers on adjacent highway); Shaw v. Soo Line Railroad Co., 463 N.W.2d 51, 55-56 (Iowa 1990) (private landowner and its business invitee owed no duty to motorists to guard against risk of harm from obstructed visibility); Bohm v. Racette, 236 P. 811, 812 (Kan. 1925) (no duty owed by landowner to refrain from maintaining hedges that obstruct view of motorists); Krotz v. CSX Corp., 496

N.Y.S.2d 190, 191 (N.Y. App. Div. 1985) (no common-law duty imposed upon landowner to control vegetation for benefit of users of a public highway).[5]

The majority seemingly acknowledges that there is no duty in Virginia of owners or possessors of land to protect sight

---

[5] Apparently suggesting that there would be no duty if the obstruction to visibility was "natural" as opposed to "artificial," the majority cites to decisions from other state courts, including several cited herein, in which the courts found no duty to users of adjacent highways when the condition was "vegetation" or "foliage." However, vegetation and foliage are artificial conditions when planted or maintained by an individual. See Fancher, 274 Va. at 554, 650 S.E.2d at 521. More importantly, in the cases cited by the majority, the courts' holdings were based on the fact that the alleged obstruction did not encroach upon the highway and not upon any distinction between natural and artificial conditions. See Driggers, 913 S.W.2d at 272 (court's holding that landowner owed no duty maintain holly bushes so as not to obscure vision of motorists based on its prior holding in Ben M. Hogan & Co. v. Krug, 351 S.W.2d 451, 456 (Ark. 1961), ruling that owner owed no duty to motorist not to erect a gravel pile that obstructed motorist's view); Williams, 974 So.2d at 1062 (court noting it has rejected a rule of no liability for natural conditions and explaining that the determinative factor is whether the condition intrudes upon the public right-of-way); Pyne v. Witmer, 512 N.E.2d 993, 997 (Ill. App. Ct. 1987) (court's refusal to impose duty based on principle summarized in Adame, 678 N.E.2d at 29 that "[t]here is simply no duty in Illinois on the part of landowners to maintain their property in such a way that it does not obstruct the view of travelers on an adjacent highway, and this refusal to find such a duty applies even where the obstruction is an artificial condition."); Krotz v. CSX Corp., 496 N.Y.S.2d at 191 (court's ruling based on holding in Hayes v. Malkan, 258 N.E.2d 695, 697 (N.Y. 1970), that private landowners owe no duty to protect users of public ways from obstructing objects located on such private property, which holding was also applied to a fence that obstructed the view of users of public right-of-way in Echorst v. Kaim, 732 N.Y.S.2d 285, 287 (N.Y. App. Div. 2001)).

lines of motorists traveling on an adjacent roadway.  However, the majority extends Virginia law to impose such a duty upon a person lawfully placing property on the premises of another with the acquiescence of the owner of the premises.  Any duty Norfolk Southern may have owed to Settle because of the permission it gave the users of the private road to cross its right-of-way and tracks would not have been transferred to RGR, nor could it be without RGR receiving some notice of its existence.  To the extent there was a duty to keep Norfolk Southern's property clear to protect travelers on an adjacent private roadway, any such duty could only, if at all, be owed to Settle by Norfolk Southern.  To the extent RGR's lumber was on Norfolk Southern's property by seven feet, it therefore could not have activated an additional duty owed by RGR to a traveler on the private roadway.  The circuit court should have granted RGR's motion to strike, as it concerns the alleged failure to maintain, inspect and keep Norfolk Southern's right-of-way.  RGR did not owe a duty to Mr. Settle to care for, maintain, keep or inspect Norfolk Southern's property.

II. Majority's Adoption of Broad Maxim as Duty

The majority opinion, in essence, allows one who fails to prove a duty was owed to him or her to assert a duty owed by a defendant because of the "due care owed to mankind generally." Overstreet v. Security Storage & Safe Deposit Co., 148 Va. 306,

317, 138 S.E. 552, 555 (1927). This is a sea change in Virginia jurisprudence that will have wide-ranging ramifications in Virginia tort law and expose practically every individual sued for a tort to have a fact finder determine if the general duty to mankind was breached.

The majority holds that RGR owed a legal duty to Settle because "[g]eneral negligence principles require a person to exercise due care to avoid injuring others" and "exercise ordinary care in the use and maintenance of [one's] property to prevent injury to others." Therefore, the majority has established a general duty not to be negligent as the specific duty owed in property and land-use negligence actions.

At its outset, this reasoning is flawed because it adopts a broad maxim as the specific duty. Such general maxims certainly underlie our analysis of whether a specific duty is owed in a given case, but a general maxim does not constitute the duty a particular defendant owes to a particular plaintiff. For example, in Rice, 191 Va. at 605, 62 S.E.2d at 26, relied upon by the majority, we acknowledged the general duty upon persons "to exercise ordinary care in the use and maintenance of [one's] own property to prevent injury to others." The jury instruction actually approved by the Court, though, was a specific duty tailored to the facts of that case and to a specific class of persons. Id. at 605-06, 62 S.E.2d at 26 ("We find no error in

66

the ruling of the trial court, instructing the jury that it was the duty of defendant to exercise ordinary care to prevent his cow from running at large beyond the boundaries of his own land.").[6]

In this case, the circuit court instructed the jury that "[e]very person has the duty to exercise ordinary care in the use and maintenance of its property to prevent injury or death to others." The instruction may be correct as a general statement of the law, but it is not a correct instruction concerning a case in which the allegation of negligence is a failure to maintain a premises so as to prevent injury to one traveling on a roadway. A review of the cases cited to support the jury instruction indicate that they are cases in which the use and maintenance of the properties involved was such that

---

[6] The majority also cites to Schulz v. Quintana, 576 P.2d 855, 856 (Utah 1978), for the court's recitation of the obligation of a landowner "to make such reasonable use of his property that it will not cause unreasonable harm to others in the vicinity thereof." Yet the court in Schulz held that the landowner owed no duty to the plaintiff who was traveling along a highway when he stopped his car, entered the defendant's land, and tripped and fell on a wooden stake. After discussing specific duties that landowners owed to users of abutting highways including those who may stray a few feet off course, the court ruled there was no duty owed by the landowner to the plaintiff since he ceased being a traveler on a highway and became a trespasser. Id. at 856-57.

some dangerous instrumentality located thereon escaped from the premises of the owner and caused direct physical injury.[7]

Contrary to the majority's suggestion otherwise, this Court has consistently required that the plaintiff be an identifiable individual or a member of a class of identifiable individuals to justify the imposition of a duty owed by the defendant to the particular plaintiff.[8]

> "The question of liability for negligence cannot arise at all until it is established that the man who has been negligent owed some duty to the person who seeks to make him liable for his negligence. . . A man is entitled to be as negligent as he pleases towards the whole world if he owes no duty to them."

Dudley v. Offender Aid & Restoration of Richmond, Inc., 241 Va. 270, 277, 401 S.E.2d 878, 882 (1991) (quoting Le Lievre v. Gould, 1 Q.B. 491, 497 (1893)).  Thus, "there is no such thing as negligence in the abstract, or in general, or as sometimes is said, in vacuo.  Negligence must be in relation to some person."

---

[7] Perlin v. Chappell, 198 Va. 861, 863-64, 96 S.E.2d 805, 807-08 (1957) (bull escaped fenced-in area of a slaughterhouse and stockyard, and injured a worker in a nearby shipyard); Rice v. Turner, 191 Va. 601, 604-06, 62 S.E.2d 24, 25-26 (1950) (a cow escaped from a fenced-in pasture and wandered onto a highway in front of a car, causing an accident); Standard Oil Co. v. Wakefield, 102 Va. 824, 826-28, 47 S.E. 830, 830-31 (1904) (failure to properly adjust a valve allowing escape of dangerous gas, causing injury when escaped gas exploded).

[8] If the majority means to establish a duty owed by owners and occupants of land to exercise due care in the use of their land with regard to "drivers on private roads located on adjacent lands," this would constitute a new duty that before today did not exist under Virginia law and is not supported by our existing precedent as previously discussed.

Kent v. Miller, 167 Va. 422, 425-26, 189 S.E. 332, 334 (1937).

"The scope of the duty will vary with the circumstances of each case, but it is always a duty owed to a discernible individual, or to a class of which that individual is a member." Dudley, 241 Va. at 278, 401 S.E.2d at 883; see also Marshall v. Winston, 239 Va. 315, 320, 389 S.E.2d 902, 905 (1990) (for negligence to be actionable, the tort victim must be "an identifiable person, or a member of an identifiable class of persons, to whom the defendants owed a duty."); Kent, 167 Va. at 426, 189 S.E. at 334 ("What may be negligence as to one person may not be so as to another."); Boggs v. Plybon, 157 Va. 30, 38, 160 S.E. 77, 80 (1931) (Because the "duty varies in each case as the facts vary . . . some particular act which would be actionable negligence under one set of circumstances would give no basis for recovery in another.").[9]

The general common law duty that the Court believes to justify the circuit court's instruction in this case is present

---

[9] "In the early English law, there was virtually no consideration of duty" or "any notion of a relation between the parties, or an obligation to any one individual as essential to the tort." W. Page Keeton, et al., Prosser & Keeton on Torts § 53 at 356-57 (5th ed. 1984). In other words, "[t]he defendant's obligation to behave properly apparently was owed to all the world, and he was liable to any person whom he might injure by his misconduct." Id. However, "when negligence began to take form as a separate basis of tort liability, the courts developed the idea of duty, as a matter of some specific relation between the plaintiff and the defendant." Id.

in all tort cases.  In this instance, plaintiff's decedent was operating a motor vehicle on a private roadway.  Virginia common law has delineated the duty owed to one who is operating a motor vehicle on a roadway.  It appears that the majority opinion will undermine tort law as we know it and require a jury verdict in every tort case based upon whether or not a plaintiff decides to "impose the duty of general tort law," whether they have pled a breach of that duty or not.

In the context of property and land-use negligence, the majority's adoption of a general maxim as the specific duty in this case renders meaningless the stratified duties this Court has previously established according to the status of the plaintiff in relation to the defendant.  As we have explained, "there is a marked difference between the duties which the occupant of land owes to trespassers, licensees and invitees, respectively.  Trespassers and bare licensees, as a rule, take the risk of the place as they find it."  Pettyjohn & Sons v. Basham, 126 Va. 72, 77-78, 100 S.E. 813, 814-15 (1919); see also Franconia Assocs. v. Clark, 250 Va. 444, 446-47, 463 S.E.2d 670, 672-73 (1995).[10]  However, an owner or occupant of land is liable

---

[10] In fact, the majority's adoption of the abstract duty is incongruent with the decision rendered in Lasley v. Hylton, ___ Va. ___, ___ S.E.2d ___ (2014)(this day decided) in which the Court invoked the specific duty owed by a landowner to a social guest, a more narrow duty than the general maxim relied upon by the majority in this case.

to a licensee, including a social guest, for injuries caused by affirmative negligence. <u>Bradshaw v. Minter</u>, 206 Va. 450, 453, 143 S.E.2d 827, 829 (1965). In contrast, an owner or occupant of land "must use ordinary care to keep his premises reasonably safe for an invitee." <u>Tate v. Rice</u>, 227 Va. 341, 345, 315 S.E.2d 385, 388 (1984). An owner or occupant of land, though, has no duty to warn an invitee of an unsafe condition that is "open and obvious." <u>Id.</u>[11] Under the majority's holding, the decisions we have rendered defining the duties owed by owners and occupants of land to trespassers, licensees, and invitees are no longer relevant, if not impliedly overruled because every plaintiff can now choose to rely upon this maxim if the duty previously imposed by common law does not suit it. In this instance, the majority rules that RGR owed a duty to Settle, who was not an entrant on RGR's premises, that it would not have owed to a trespasser or licensee on its premises.[12]

---

[11] As the majority notes, RGR contends that the circuit court relied upon premises liability law to impose a duty in this case. RGR's point is well-taken because the duty imposed by the circuit court mirrored the duty owed by an owner or possessor of land to an invitee on its premises, which Settle certainly was not. Yet, this duty failed to take into account that an owner or occupant of land owes no duty to warn of an open and obvious condition, which the stack of lumber surely was.

[12] The decisions we have rendered on duties owed by owners and occupants of land have depended not only on the status of the injured party in relation to the defendant, but on the use

71

In actions against owners and occupiers of land by plaintiffs injured off the defendant's premises, we have similarly required a relation between the defendant and plaintiff that would justify the imposition of a duty. As discussed previously, we have imposed limited duties upon owners and occupants of land to travelers on abutting public highways and owners of adjoining land depending on the act or condition encroaching upon the abutting highway or property. For example, in Cline, 284 Va. at 107-10, 726 S.E.2d at 17-18, we recognized the "broad common law maxim" precluding "use of land so as to injure the property of another" but analyzed and determined whether there was a duty owed by the defendant to the plaintiff in that case based on the specific duties owed by landowners to travelers on abutting public highways and the nature of the encroachment onto the highway. [13] Under the majority's holding in this case, the adoption of the broad maxim as the duty owed

_____

of the premises and act complained of as well. For example, we have "decline[d] to extend to a householder the duty imposed upon commercial establishments, carriers, municipalities, and landlords to remove natural accumulations of snow and ice within a reasonable time after the end of a storm." Tate, 227 Va. at 348, 315 S.E.2d at 390.

[13] See Price, 149 Va. at 543, 140 S.E. at 646 (recognizing "two classes of things that an adjoining landowner may do at his peril in connection with a public easement"); see also cases cited supra note 4.

eliminates the necessity of any assessment by the courts of the duty owed by a defendant to a plaintiff in a given case.

In sum, the Court's adoption of a broad maxim as the duty in this case is inconsistent with the specifically defined duties, including their limitations, this Court has previously imposed upon owners and occupants of land. Because the Court adopts this general principle as the specific duty in this case without regard to the plaintiff's status or relation to the defendant or the nature of the purportedly dangerous condition on the premises, the Court's holding imposes on all owners or occupants of property a duty that is broader than that previously imposed under circumstances in which either the duty owed was more limited or even non-existent.

Furthermore, because the Court approves a jury instruction reciting this broad maxim as the controlling duty, specific jury instructions traditionally given in cases against property owners based upon these specific duties are no longer relevant. See, e.g., 1 Virginia Model Jury Instructions – Civil, Nos. 23.000 through 23.130 and 29.000. A plaintiff can now elect to rely on this general maxim and its corresponding instruction as establishing the duty. Under the Court's holding, therefore, the general maxim establishes the duty in property and land-use negligence cases and it is no longer necessary or even appropriate to determine what specific duty a particular

73

defendant owes to a particular plaintiff in a given case. Thus, for all intents and purposes, the Court has eliminated duty as an essential element in actions alleging negligence against owners and occupants of property.

III. Contributory Negligence

I also disagree with the majority's holding that the issue of Settle's contributory negligence was properly submitted to the jury. As recited by the majority, this case was previously decided, and upon a petition for rehearing, the Court's opinion was withdrawn and a new majority opinion is now issued. I believe the Court's initial opinion, holding that Settle was contributorily negligent as a matter of law, was correct. Therefore, I incorporate herein the Court's original analysis. Additionally, in my opinion, Mrs. Settle's own evidence established that Settle was contributorily negligent as a matter of law in deciding to cross railroad tracks under circumstances in which, under her view of the case, neither looking nor listening could have led Settle to avoid the collision.

RGR asserts that the circuit court erred by denying its motions to strike and to set aside the verdict because Settle was contributorily negligent as a matter of law. RGR contends that Settle was familiar with the Kapp Valley Way crossing, and that although other individuals heard the train's horn when it approached the Route 15 crossing, Settle did not look to his

74

right or left and did not stop before attempting to cross the railroad tracks despite the approaching train. According to RGR, Settle failed to exercise reasonable care before crossing the tracks and his failure to do so was a proximate cause of the accident.

As Settle approached the Kapp Valley Way railroad crossing, he "had the duty to look and listen with reasonable care; he did not have the absolute duty to discover the presence of the train, unless by so looking and listening he was bound to have discovered it." Norfolk & W. Ry. Co. v. Greenfield, 219 Va. 122, 132, 244 S.E.2d 781, 786-87 (1978).[14] "Repeatedly, we have said that a railroad track is a proclamation of danger and the operator of a vehicle approaching a grade crossing 'is required to look and listen at a time and place when both looking and listening will be effective,' intelligently using both eyes and ears." Wright v. Norfolk & W. Ry. Co., 245 Va. 160, 171, 427 S.E.2d 724, 730 (1993) (quoting Norfolk & W. Ry. Co. v. Epling, 189 Va. 551, 557, 53 S.E.2d 817, 820 (1949)). Further, "[i]f a traveler drives blindly upon a crossing whether his view is

_____

[14] The jury was instructed that "[a] driver crossing train tracks has the duty to look and listen with reasonable care; he [does] not have the absolute duty to discover the presence of the train, unless by so looking and listening he was bound to have discovered it," and that a driver has the "duty to use ordinary care to look and listen effectively for an approaching train before crossing the tracks," even if the railroad failed to sound a horn, and "to stay off the tracks if he becomes aware of an approaching train."

obstructed or unobstructed, takes no precautions for his safety and is injured, his negligence will preclude any recovery on his part." Southern Ry. Co. v. Campbell, 172 Va. 311, 318, 1 S.E.2d 255, 258 (1939). "'He can not wait until his view is obstructed and say it would have been useless for him to have looked then.'" Id. (quoting Virginian Ry. Co. v. Rodgers, 170 Va. 581, 587, 197 S.E. 476, 478 (1938)).

We applied these principles in Wright, the facts of which are strikingly similar to those in this case. There, the plaintiff, an experienced dump truck driver, was "thoroughly familiar" with a public railroad crossing, having "traversed it in his truck on nine occasions during a two-day period before" a collision occurred between his truck and a train. Wright, 245 Va. at 171, 427 S.E.2d at 730. The plaintiff was aware that he needed to rely on his senses of sight and sound to detect an approaching train because there were no automatic warning devices at the crossing. Id. He further knew of "the limitations to sight and hearing" due to the configuration of his truck's cab and the angle of the street relative to the railroad tracks. Id. Nevertheless, the plaintiff "drove his truck from a stopped position of safety onto the crossing directly in front of the train when its engine was less than ten feet away." Id.

The plaintiff's experts in that case testified that it was "impossible" for the plaintiff to have seen or heard the train and that the crossing was "not reasonably safe" and "ultrahazardous." Id. at 164-65, 427 S.E.2d at 726 (internal quotation marks omitted). Nevertheless, the trial court concluded that the plaintiff was contributorily negligent as a matter of law. We agreed, stating that the plaintiff, "knowing the dangers to be encountered at the crossing," could have taken numerous steps to avoid the collision, including "open[ing] his window after his truck had been loaded and before [leaving] the quarry [or] making a wider right turn, thus bringing his truck to an attitude with relation to the crossing that he could see clearly north along the track." Id. at 171-72, 427 S.E.2d at 730. But, the plaintiff did none of those things and thereby caused the accident. Id. at 172, 427 S.E.2d at 730; see also Greenfield, 219 Va. at 133, 244 S.E.2d at 787.

We should reach the same conclusion in this case. The uncontradicted evidence established that Settle was familiar with the crossing, having proceeded through it numerous times on the day of the accident. He had notice of the limited sightline posed by the configuration of the lumber stacks and the angle of the tracks to both east and west. In light of this known danger, "reasonable care" required Settle to approach the crossing in such a way that would allow him to stop before

77

reaching the tracks if, by looking and listening, he was bound to detect an approaching train. See Campbell, 172 Va. at 317, 1 S.E.2d at 257 ("A traveler . . . must always exercise care proportioned to the known danger, and this care must be such as one who knows the danger and of the prior right of passage [of the moving train] would be expected to exercise.").

According to the individuals who witnessed the accident, Settle was traveling slowly as he approached the crossing, at a speed of approximately five miles per hour or less. Regardless of his speed, Settle did not approach the crossing in a manner that would have enabled him to stop when looking and listening with reasonable care would have revealed the presence of the train. Either Settle failed to look and listen with reasonable care; or if he did so, he failed to see the plainly visible approaching train; or if he did observe the train, he failed to stop before traveling onto the tracks. Under any of these scenarios, Settle failed to exercise reasonable care for his own safety despite the known dangerous sightline at the Kapp Valley Way crossing. See Norfolk & W. Ry. Co. v. Benton, 160 Va. 633, 641, 169 S.E. 560, 563 (1933) (holding that the plaintiff "either did not look toward the approaching train which was in his plain view practically all the time, or if he looked no heed was given to it" and that "[s]uch conduct in either event [was] contributory negligence as a matter of law"); Norfolk & W. Ry.

Co. v. Hardy, 152 Va. 783, 796, 148 S.E. 839, 842 (1929) (same); Rodgers, 170 Va. at 589, 197 S.E. at 479 (same). Settle's failure to do so was negligence as a matter of law and that negligence was a proximate cause of the accident and his death. See Ford Motor Co. v. Boomer, 285 Va. 141, 150, 736 S.E.2d 724, 728 (2013) ("The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred.") (internal quotation marks and citation omitted).

In contrast to the facts in Wright and in this case, those in Campbell were such that a jury, not the trial court, should determine whether the plaintiff there was contributorily negligent. In Campbell, obstructions prevented the plaintiff from having a clear view of the railroad tracks for trains approaching from the right until the front of his truck was near the rails. 172 Va. at 315, 1 S.E.2d at 256. The automatic warning gong with a red light in its center was flashing when the train moved forward over the crossing and stopped when the train advanced beyond the crossing. Id. After lowering his window, looking, and listening, the plaintiff believed that the train had passed on and thus drove slowly onto the crossing, when his truck was struck by the backward movement of the train coming from the plaintiff's right. Id. We concluded that the

plaintiff's "conduct on approaching the crossing under the surrounding conditions, measured by what a prudent man in the exercise of ordinary care would have done under like circumstances, was at least such as would cause fair-minded men to differ."  Id. at 319, 1 S.E.2d at 258.  We cannot say the same with regard to Settle's conduct.

Mrs. Settle, however, argues that the question of contributory negligence was for the jury because pertinent facts were disputed and because Settle faced a predicament at the crossing, helpless to oncoming trains whether he stopped at the crossing or approached it slowly.  If Settle had stopped his truck just past the lumber stacks so he could see a train coming from the west, Mrs. Settle contends, he would have been unable to get his dump truck moving fast enough to safely cross the tracks before a train — not viewable at the time he stopped — could have approached from the east, where a curve in the track limited Settle's visibility to 600 feet.  Because Settle's truck, when fully loaded, could accelerate at the rate of only one-to-two miles per hour in first gear and three-to-four miles per hour in second gear, and because shifting gears in the truck took additional time, Mrs. Settle argues that stopping to look for oncoming trains would have put Settle at great risk to be hit by a train approaching from the east.

However, Mrs. Settle's argument itself establishes the basis for contributory negligence as a matter of law. She asserts that due to the size and gearing characteristics of Settle's dump truck and the weight of the load he was hauling, it was both "dangerous to stop" and "dangerous to go" upon approaching the Kapp Valley Way crossing. In particular, if Settle looked to his right upon clearing the lumber stack and saw an oncoming train, he would not have had sufficient time and distance to stop his truck even at walking speed. If Settle did stop prior to crossing the tracks and determined no train was coming from the west and then proceeded to cross the tracks, he would not have had sufficient time to avoid a collision with a train coming from the east, with only 600 feet of track visible to the east. Therefore, she argues that Settle could not avoid a collision with an oncoming train regardless of the speed at which he was driving and regardless whether he looked and saw an oncoming train.

Mrs. Settle argues that the safest course for Settle was to approach the crossing slowly without stopping despite the fact that this course was no safer than stopping before crossing. The majority concludes that "Settle was forced to rely on his hearing," a course that was also unsafe due to his diminished

ability to hear.[15]  This "dangerous to stop" and "dangerous to go" predicament was known to Settle who, prior to the accident, made six trips to deliver gravel to the construction site on the day of the accident alone.  With full knowledge of these conditions – that he would not be able to stop if he saw a train and would not be able to hear if the train blew its whistle - Settle chose to proceed into the crossing.  In other words, no precaution was reasonable once Settle made the decision to cross.[16]

Under Mrs. Settle's view of the evidence, then, the issue is not whether Settle discharged his duty to look and listen in such a manner that was effectual because, under Mrs. Settle's view of the case, looking and listening could never be effectual considering the presence of the lumber stack, the size of Settle's truck, the gearing characteristics, the weight of his

---

[15] The fallacy in this reasoning and Mrs. Settle's contention is that this position assumes Settle was "forced" to cross the tracks in the first place. Under this rationale, Settle's only option was to attempt a crossing that was unsafe regardless of whether he looked or listened and regardless of whether he approached slowly or stopped.  Thus, according to Mrs. Settle and the majority, Settle's contributory negligence was a question for the jury since reasonable minds could differ as to whether approaching the crossing at a slow rate of speed constituted the exercise of due care.  Yet, under Mrs. Settle's view of the evidence and her argument, even approaching the crossing at a slow rate of speed was no precaution at all.

[16] A Norfolk Southern employee testified that as a result of the construction traffic, a flagging service could have been requested at the Kapp Valley Way crossing, but no such request was received.

load, and his diminished ability to hear noises outside his cab. Rather, the issue is whether reasonable minds could differ on whether Settle was exercising reasonable care for his own safety when he chose to cross railroad tracks under circumstances in which no amount of looking and listening could have avoided a collision with an oncoming train.  As we have stated, "[i]f a traveler drives blindly upon a crossing whether his view is obstructed or unobstructed, takes no precautions for his safety and is injured, his negligence will preclude any recovery on his part."  Campbell, 172 Va. at 318, 1 S.E.2d at 258.  In my view, reasonable minds could not differ on the conclusion that Settle took no precautions for his safety in deciding to cross railroad tracks under circumstances, established by Mrs. Settle's own evidence and arguments, in which neither looking nor listening could have led him to avoid the collision.